38 C.C.P.A.(Customs)

## UNITED STATES v. KUNG CHEN FUR CORP.

### No. 4640.

United States Court of Customs and
Patent Appeals.

Feb. 27, 1951.

David N. Edelstein, Asst. Atty. Gen. (Richard F. Weeks, Special Atty., New York City, of counsel), for the United States.

Barnes, Richardson & Colburn, New York City (Albert MacC. Barnes, Samuel M. Richardson, Hadley S. King and Eugene F. Blauvelt, all of New York City, of counsel), for appellee.

Siegel, Mandell & Davidson, Lane, Young & Fox and Brooks & Brooks, Lane & Wal-

lace and John D. Rode, all of New York City, associate counsel for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges.

GARRETT, Chief Judge.

This is an appeal from the judgment of the United States Customs Court, First Division, C. D. 1203, 24 Cust.Ct.—, entered in conformity with the decision of the majority, Mollison, J. dissenting, sustaining importer's protests claiming free entry for plates of kid skins imported from China and entered, under the Tariff Act of 1930, at the port of New York in February 1935.

Two protests, Nos. 811174–G and 909743–G, are involved. The merchandise being similar and the protests substantially identical, the cases were consolidated for trial and disposed of by the Customs Court in a single opinion and judgment.

The merchandise was classified by the Collector of Customs under paragraph 1519(a) of the Tariff Act of 1930, 19 U.S. C.A. § 1001, par. 1519(a), which reads: "Par. 1519(a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; all the foregoing, if dyed, 30 per centum ad valorem."

The claim relief upon by the importer and sustained by the majority of the Customs Court is that the merchandise is classifiable under paragraph 1681 of the act, 19 U.S. C.A. § 1201, par. 1681, which provides for entry free from payment of customs duties of "Furs and fur skins, not specially provided for, undressed."

More specifically, it is contended on behalf of the Government that the merchandise consists of plates of *dressed* kid skins, while it is contended on behalf of the importer that the kid skins forming the plates are furs or fur skins, undressed, and, as we view the controversy, the primary or fundamental issue involves determination of the meaning of the term "dressed" as used in respect of furs and fur materials.

Both protests contained an alternative claim under the provision in paragraph 1558 of the act, 19 U.S.C.A. § 1001, par. 1558, for all unenumerated articles manufactured, in whole or in part, not specially provided for, subject to a duty of 20 per centum ad valorem, but this seemingly was not relied upon by the importer before the Customs Court, and before us it is argued expressly that it is not applicable. We, therefore, treat that claim as having been abandoned so far as the importer is concerned.

The Government, however, did rely upon it below and relies upon it before us *as an alternative claim*—that is, the Government contends before us that if the collector's classification under paragraph 1519(a) be held erroneous, it should be held that the merchandise is classifiable as an unenumerated manufactured article under paragraph 1558 and the judgment appealed from modified to that extent.

Before the trial court the Government made an additional alternative claim for classification under paragraph 1519(e), but no contention to that effect was presented before us, and it requires no attention by us.

In the course of its decision sustaining the importer's claim for classification under paragraph 1681 with duty-free entry, the trial court stated, in substance, that the case presented for the first time the question of the dutiable status, under the provisions of the Tariff Act of 1930, of plates made of kid skins.

To this we may add that no case involving the dutiable status under the 1930 act of *plates* made of dog skins or of goat skins has been before us, but we have had two cases involving the dutiable status of individual dog skins and one involving the dutiable status of individual goat skins, and these are the leading cases cited relative to the issues here before us.

The first of the two dog skin cases was that of United States v. Rotberg & Krieger, 24 C.C.P.A., Customs, 441 T.D. 48902, 71 Treas. Dec. 571, which was an appeal from the judgment of the United States Customs Court, Rotberg & Krieger v. United States, T.D. 48068, 68 Treas. Dec. 895. In our decision it was stated that only two of the

judges of the Customs Court participated in the decision there rendered and that, while both held the dog skins (which had been imported from China) to be undressed and entitled to free entry, one was of opinion that the merchandise was classifiable under paragraph 1681 and the other that it was classifiable under paragraph 1765, 19 U.S. C.A. § 1201, par. 1765. In affirming the judgment, this court in a unanimous decision held that the dog skins should have been classified under paragraph 1681, thus sustaining that ground of the importer's protest. We held that the processing which the skins had received in China was not a dressing process within the meaning of paragraph 1519(a) and as to an alternative claim under paragraph 1558 held that the merchandise being undressed furs fell within the classification, "Furs and fur skins," and so was enumerated, thus rendering paragraph 1558, which provides for only unenumerated articles, inapplicable.

The second case involving the dutiable status of dog skins (also imported from China) under the Tariff Act of 1930 was that of United States v. Arnhold & Co., Inc., et al., 27 C.C.P.A., Customs, 135, C.A.D. 74, which was an appeal from the judgment of the Customs Court, Arnhold & Co., Inc., et al v. United States, C.D. 44, 1 Cust.Ct. 170. This was virtually a retrial of the issues involved in the Rotberg & Krieger case, supra, upon a new and more elaborate record. A majority of the Customs Court held that the dog skins were undressed fur skins entitled to free entry under paragraph 1681, supra. The late Judge Charles P. McClelland of that court agreed with the majority that the dog skins were not dressed "within the meaning of that term as used in paragraph 1519(a)," but dissented as to the classification, expressing the view that what had been done to them in China rendered them classifiable under paragraph 1558, supra, with duty at 20 per centum ad valorem. This court in an opinion by the late Judge Lenroot (Jackson, J. not participating) agreed with the majority of the trial court that the dog skins should have been classified under paragraph 1681 and admitted duty free.

The case involving the dutiable status of goat skins under the Tariff Act of 1930 was that of United States v. Winograd Bros., Inc., 32 C.C.P.A., Customs, 153, C.A.D. 302, which was an appeal from the judgment of the United States Customs Court, Winograd Bros., Inc. v. United States, C.D. 708, 9 Cust.Ct. 285, from which judgment the late Judge Thomas J. Walker of that court dissented. The majority held, as was held by the majorities relative to the dog skins, that the goat skins should have been classified under paragraph 1681, supra, and admitted duty free. It was the view of Judge Walker that the skins involved were dressed within the meaning of the term as used in paragraph 1519(a), supra, and that the collector's classification under that paragraph with duty assessment at 25 per centum ad valorem should be sustained. The merchandise was imported from China.

Our decision in the Winograd Bros., Inc. case, supra, is particularly emphasized by the importer in the instant case in view of a former holding that kid skins are covered by the appellation "goat skins." See Draeger Shipping Co., et al. v. United States, 15 Ct.Cust.App. 454, T.D. 42644, which arose under the Tariff Act of 1922. It has no particular pertinency here, except as to the declaration to the effect that in common understanding a kid skin is a goat skin—a matter not contested by the Government in either that case or the instant case. We have had no prior case under the Tariff Act of 1930 involving any form of kid skins.

The dissenting opinion of Judge Mollison in the instant case does not appear to question the finding of the majority that the processing shown to have been applied in China to the kid skins of which the involved plates were made was substantially the same *up to the step of beginning the formation of the plates* as the processing applied to the dog skins and goat skins involved respectively in the Rotberg & Krieger, Arnhold & Co., and Winograd cases, supra, nor do we find in his opinion any question suggested as to the finding of the majority relative to the processing

which takes place in the United States, after the importation is consummated.

His dissent seems to be based solely upon certain legislative history recited in his opinion. Whether or not this was presented in the argument of counsel for the Government before the Customs Court cannot be determined from the record. The majority opinion makes no reference to it.

Before us counsel for the Government practically relies upon the history so recited as the ground for reversal of the judgment, and it is required that we consider and pass upon it.

Before doing so, it is deemed proper to set forth a description of the processing applied to the skins in China from their raw state up to their condition when exported. It is conceded by Government counsel that up to the point where forming them into plates began the various steps were in all respects here material the same as the steps of the process applied to the dog and goat skins involved in the cases hereinbefore cited.

In the Rotberg & Krieger case, supra, the description of the treatment given the dog skins reads as follows: " * * * The first process applied to the skins when treatment of them actually begins is to scrape off fat and remove dirt. They are then placed in the sun for drying. After being dried, they are placed in barrels or vats containing water with which there is mixed a flour, described as "dalyon flour," made from some kind of Chinese cereal. They remain in these barrels or vats for several days—one witness says, "perhaps six or seven days." They are then taken out and put in the sun for drying. After being dried, if any are in a very hardened condition such are returned to the barrel or vat, again soaked, and again dried in the sun. After being dried, the skins are packed in bales, 200 to 300 skins to the bale, by press packing machines, and thus exported."

After this statement we continued:

"So far as the record discloses, the foregoing constitutes the whole of the processing which takes place in China, and the primary question is, Does such processing render the skins dressed furs or dressed fur skins within the meaning of paragraph 1519(a), *supra?*

"Much of the brief on behalf of the Government is devoted to emphasizing parts of the testimony to the effect that the merchandise is referred to in China as 'dressed' 'dogskins', and it is said in the brief, 'The Chinese dogskins here involved were described on Consular invoice No. 1414 as "Tanned Mukden Dogskins" and were entered, Entry No. 706397, as "Five Bales Tanned Dogskins (Dressed Furs Not Dyed)".'

"We regard it as being of small consequence that the merchandise may have been referred to in China as dressed dogskins, nor is it of particular importance under what names or names the skins were ordered. *The question of what they actually are must be determined by United States trade standards.* [Italics new here.] James F. White & Co. v. United States, 23 C.C.P.A., Customs, 224, T.D. 48061. Neither are the notations on the consular invoice and the entry papers controlling if satisfactory evidence be presented by either party showing the statements to be erroneous. United States v. Puttman[n], 21 C.C. P.A., Customs, 135, T.D. 46466, and authorities there cited."

When the issues of the Rotberg & Krieger case, supra, were retried upon a more elaborate record in the Arnhold & Co. case, supra, we quoted the description given in the former case and added: "In the case at bar it is established that, in addition to the process described in the Rotberg record, there was employed in the treatment of the skins in China sea salt [not shown in the testimony in the Rotberg case], to the extent of three-quarters to 1 pound to the gallon of water, and that sea salt contains sodium sulphate and sodium chloride."

and commented: "The real issue, therefore, is whether, in treating the dogskins in China, the use of sea salt in the quantity above stated, in addition to the water and flour testified to in the Rotberg case, rendered the skins dressed or partially dressed."

The description of the treatment given the goat skins involved in the Winograd case, supra, while somewhat more elaborate than the description in the Arnhold & Co. case, supra, did not differ from it in any respect here material and need not be repeated.

It was held, in effect, by the majorities of the trial court in all three of the cases, upon the basis of the evidence presented, that the treatments applied in China were for the purposes of preservation and not for the purposes of dressing the skins preparatory to their use in the making of garments, and we agreed with this view, it being our opinion that the dressing contemplated by the adjective "dressed," used in paragraph 1519(a), was not the treatment shown to have been made in China, but the dressing contemplated by American trade standards, the test of such standard being, as expressed in the brief on behalf of the importer before us in the instant case, "the usability in the United States of the imported fur in the manufacture of fur garments or fur articles."

In the Arnhold & Co. case, supra, we quoted and approved certain phraseology taken from the decision of the trial court in that case, wherein there was much testimony as to what was done to the skins after their importation into the United States. The testimony in the instant case is similar in all material respects to that given there and we here repeat the quotation: "It must be constantly kept in mind that what was done to these skins in the United States was irrespective of the work that was done in China. Whether or not these skins were fully preserved or partially so in China, all the material used in such preservation in China was washed out or removed in the United States, and the skins restored to their natural condition. The process through which these skins passed *in the United States* to fit them for ultimate use were all the processes that were necessary to render them dressed skins. *Every necessary process of dressing took place in the United States, and what was done to these skins in China was without any assistance or benefit to their dressing in the United States.* Therefore, the facts fully warrant the holding that this merchandise did not receive a single element of manufacture in China that was of any use to their dressing or manufacture in the United States; that what was done in the United States was for the purpose of fully dressing the skins and rendering them usable material for manufacture into fur articles or garments. The authorities fully sanction this holding, and a re-reading of the testimony is convincing that what was done in China had not any reference to dressing, and was wholly useless in the manufacture of these skins. Therefore, the elements of dressing and manufacture have been driven out of this case by the overwhelming weight of the testimony." [Italics new here.]

The description of the treatment of the kid skins here involved, up to the point when formation of the plates began, is stated in the majority opinion of the Customs Court as follows: "The raw kidskins were first soaked in water until soft; then they were scraped with a certain kind of knife to remove blood, dirt, and flesh from the under side of the skins. Following this, they were placed in vats, called "kongs," into which had been poured a solution consisting of water, millet flour, and sea salt. They remained in this solution from 3 to 7 days, depending upon temperature, type of skin, etc., during which time they were occasionally stirred. After they were removed from the kongs they were hand-kneaded to soften them, and then they were permitted to dry, after which they were again softened by hand and then piled with a heavy weight on top to keep them flat."

It is obvious that if mere kid skins not processed further than those immediately above described were the merchandise involved, and the matter of legislative history introduced by the dissenting opinion disregarded, the principle of *stare decisis* clearly would be applicable upon the record made up at the trial and now before us, because we find no new evidence which distinguishes such processing from that followed in the three cases cited, *supra*.

The *opinions* of the witnesses, called on behalf of the respective parties, as to the effect of the treatment given the individual

skins in China differed, just as was the situation in the prior cases cited. As stated in the majority opinion of the trial court: "All of the witnesses for the plaintiff testified that the plates here in question had to be further processed in this country before dyeing to make them ready for the manufacturer of garments and that in the condition as imported the plates were not dressed. The Government's witnesses, on the other hand, maintained that the process which took place in China was a dressing process and that these plates were made up of dressed kidskins."

The courts, of course, are not bound by the opinion testimony, although at times it may be helpful, but it may be said that if it were binding, we think the great weight of such testimony in the instant case supports the contention made on behalf of the importer.[1]

However, we are not dealing here with merchandise consisting of mere individual skins, because the individual skins have been formed into plates. The majority opinion, after its description of the treatment of the kid skins quoted, *supra,* continues: " * * * Following this, the skins were sorted according to the different types of hair character, after which groups of selected skins were laid out within a marked-out area or block which was the size and shape of the ultimate plates or mats. The rough edges and the bad pieces · were trimmed off the skins, and if this resulted in an unfilled area in the marked-out block, other pieces would be fitted therein. Following this, the skins were sewn into the

---

1. The record in this case is the most elaborate of the several records which have been before us relating to the subject matter involved. It covers more than 1100 printed pages and includes many exhibits—documentary and physical, principally the later. In appendices to their briefs counsel for the respective parties have aided the court materially by summarizing the testimony which together with the quarrels about the admission of much of it cover about 1000 printed pages. The following is from the opinion of the majority of the trial court:

"The record covers over 2,000 [typewritten] pages of testimony, with some 42 exhibits. The case was also ably briefed by both litigants. It would be impractical to attempt to digest all the testimony in this opinion and in view of our decision it is unnecessary. Plaintiff introduced the testimony of 24 witnesses, including in their number: Importers and dealers, fur dressers and dyers, fur garment manufacturers, and Chinese shippers.

\* \* \* \* \* \*

"In support of the collector's classification the Government introduced the testimony of 13 witnesses, among them being fur examiners at the port of New York, fur garment manufacturers, and a former employee of a dressing and dyeing concern; also, a fur flesher, and 35 physical exhibits.

\* \* \* \* \* \*

"We have before us as illustrative exhibits various plates, kidskins, portions of plates and skins, and what remains of a fur coat which had been ripped apart (defendant's illustrative exhibit 37), together with plates similar to the imported kidskin plates (plaintiff's illustrative exhibits 1-A to 1-F). Additional plates were added by the Government to complete what was claimed to be a complete line of hair design (defendant's illustrative exhibits 34, 35), together with a gray kidskin plate (defendant's illustrative exhibit 6), which was claimed by the defendant to be similar, except for color, to the imported plates. There is also a sample of a raw kidskin (illustrative exhibit 5). We also have a portion of a soft brown kidskin plate introduced by the Government and identified by plaintiff's witness Ohsman as a dressed and dyed kidskin plate (exhibit 20). In Government's illustrative exhibit 9, a manual on furs, there appears a statement at page 3, question 5, "The best skins all come in raw. Skins of poorer quality come into this country in plates, and plates always come in dressed." It is · our belief that by the term "dressed" the author in referring to the China dressing or China processing which produces a skin similar to those going into the kidskin plates before us.

"It is clear from this record, and from a physical examination of the exhibits, that the samples of plates, and portions of plates (such as illustrative exhibit 10, exhibit 20, illustrative exhibit 28, collective illustrative exhibit 27-A and B) which have been further processed and dyed after importation are softer and more pliable than the plates in the condition in which imported (illustrative exhibits 1-A to 1-F)."

rectangular sheets of fur which are the plates in question."

So, in the final analysis, legislative history disregarded for the nonce, the question now before us is whether the steps followed in China in forming the plates after the prior treatment had been concluded were dressing steps so that the resulting plates became plates of dressed kid skins in the sense of the term "dressed" as that term heretofore has been defined and applied in the cases involving the classification of individual dog skins and individual goat skins.

In Webster's New International Dictionary "Plate" when used in respect to furs is defined as "Skins for fur linings of garments, sewed together and roughly shaped, but not finally cut or fitted."

Funk & Wagnall's New Standard Dictionary defines the term as "Pelts sewed together, but unfitted, to be used as linings for garments."

It is assumed by us that, as used in paragraph 1519(a), *supra,* it was not intended to limit the meaning of plates, as the dictionaries limit it, to material for fur linings, but that it was intended to include also those plates of fur skins used as materials for articles other than linings. That plates constitute materials and not finished products, however, is well understood.

In any event, we take it to be commonly understood that the merchandise here involved consisting of skins sewed together, although not even roughly shaped to the form of any garment, is known as plates of kid skins, but this does not of itself determine their proper classification for customs purposes. The question lying back of the name is: Are the plates made of *dressed* kid skins or of *undressed* kid skins? That question brings us directly to the inquiry hereinbefore stated as to whether the formation in China of the plates, after the skins had undergone the chemical processing, or "Chinese dressing," applied to it in China, was a dressing process, according to the United States trade standard as that standard hereinbefore has been defined.

It is our view, as we understand it to have been the view of the trial court, that any in-sistence that the formation of the plates was a dressing step is wholly untenable. So far as we can discern, making the skins into plates did not advance them toward any use intended to be made of them in the United States in any respect whatsoever. It is doubtlessly true that in the form of plates the skins can be more conveniently and economically treated, dyed, and dressed according to United States trade standards than they can be as individual skins, but that does not make the trimming given the skins and the sewing together in China a dressing process. The weight of the evidence is to the effect that the plates have to be ripped apart completely and the seams resewn before they can be used commercially in making garments.

Accordingly, we agree with the finding of the trial court to the effect that the merchandise consists of plates of undressed kid skins.

Normally, not being made up of dressed kid skins, the merchandise does not fall within the classification provided in paragraph 1519(a), *supra,* and since it falls within the description of either fur or fur skins it would be classifiable under paragraph 1681, *supra,* if the rule stated in the decision of the Rotberg & Krieger, Arnhold & Co., and Winograd cases, supra, be followed. Being a fur or fur skin it is enumerated in the latter paragraph and there is no room for the application of paragraph 1558.

In the immediately foregoing paragraph we have used the word "normally" and have not stated a final conclusion, because the matter of legislative history, to which allusion hereinbefore has been made, requires consideration.

Up to this point we have considered the controversy solely in the light of the statute as written. In the cases relating to the subject matter of dressed dog and goat skins no suggestion has ever been made that the statute as written is ambiguous, requiring extrinsic aid to determine its meaning.

It is well settled, of course, that where ambiguity exists in the phraseology of a statute it is proper to resort to various rules, including an examination of legis-

lative history, as an aid in construing it in order to arrive at the legislative intent. This principle is so thoroughly established that no citation of authority is deemed necessary in its support.

■ It is equally as well settled that extrinsic aid properly may be invoked only after ambiguity has been found to exist; or, to state it differently, it is not proper to invoke extrinsic aid and thereby create ambiguity. In the case of Railroad Commission of Wisconsin et al. v. Chicago, Burlington & Quincy Railroad Co., 257 U.S. 563, 588–589, 42 S.Ct. 232, 238, 66 L.Ed. 371, the Supreme Court of the United States declared that extraneous aids "are only admissible to solve doubt and not to create it." See also S. Nathan & Co., Inc., v. United States, 37 C.C.P.A., Customs, 99, C.A.D. 426, with citations, and United States v. Singer Manufacturing Co., 37 C.C.P.A., Customs, 104 C.A.D. 427, with citations.

■ We indulge the further observation that matter relating to legislative history, which matter itself requires construction in order to understand it, is of no great aid to a court in construing a statute to which such matter purports to relate.

Furthermore, not everything which may bear some relation to the formation and enactment of a statute is pertinent to the legislative history of that statute. Congress has not delegated to unofficial individuals or organizations, which may appear before one of its committees advocating legislation, the authority to construe for it and the public statutes which it enacts. Courts have the authority to do that.

Usually, of course, a committee of Congress in a report accompanying a bill, passage of which it recommends, explains the bill, and such reports almost always are looked to by the courts when called upon to construe a statute regarded as ambiguous, in order that the legislative intent, as expressed by the legislature itself, may be determined and followed.

■ Laterally there has been a disposition on the part of the courts to attach some weight to interpretations of a measure made by the member of Congress having in charge a bill during its consideration in the House or Senate, and to explanations made by members who offer amendments, but, so far as we have been able to ascertain, there has been no material departure from the principle stated long ago by the Supreme Court of the United States in the case of Aldridge et al. v. Williams, 3 How. 9, 44 U.S. 9, 11 L.Ed. 469, wherein a customs classification case was involved, reading: "In expounding this law, the judgment of the court cannot, in any degree, be influenced by the construction placed upon it by individual members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed."

■ At any rate, we have been unable to find where any court has held that statements made by unofficial persons before committees of Congress, when advocating the passage of legislation, properly might be looked to as an aid in the construction of such legislation.

In the case of United States v. Paramount Publix Corp., 22 C.C.P.A., Customs, 452, 460, T.D. 47453, 67 Treas.Dec. 22, 28–29, this court compared the statute involved with the provisions in the Tariff Act of 1922; examined the material gathered by the United States Tariff Commission in its capacity as an aid or agent of Congress; considered the public history of the time when the act was passed; and gave attention to the sworn testimony introduced during the trial of the case, but in respect of the statements made at the hearings before the committee of the Senate during the formation of the tariff measure, we said:

"When the Committee on Finance of the United States Senate had under consideration the change above noted, parties interested in bringing about such a change were

heard by such committee. (Hearings, Tariff Act of 1929, Volume III, page 946 et seq.) Such hearings show that the committee made close inquiry of the interested parties as to what the changes would mean if made and a colloquy involving that question took place between one of the interested parties and a member of the 'Committee, which we will not quote here.

"This circumstance has been called to our attention as being a part of the legislative history of the provision. While such subject matter may be related to the enactment of the provision, we feel certain it should not be resorted to for the purpose of showing the intent of the legislature. *We think it would be an unsafe practice for courts to permit such a consideration to be control-ling since the enactment of the provision in the language before us might have been with an intent wholly different from that indicated by the witnesses.*" [Italics new here.]

We have dwelt at some length upon this phase of the case not because we regard the statute as ambiguous, because we do not so regard it, but out of respect for the views of those who think otherwise. Even if we be in error as to this, however, we do not regard such legislative history as has been cited here controlling.

The contention on behalf of the Government respecting this phase of the controversy is predicated almost wholly upon a brief [2] which was filed by The National Association of the Fur Industry, on behalf

2. The portion of the brief filed by The National Association of the Fur Industry which appears to be regarded pertinent by counsel for the Government and which was quoted in the dissenting opinion reads:

"Changes Necessary for the Sake of Fairness and Reason

"There is no doubt that paragraph 1420 [of the Tariff Act of 1922] has, since it was given its present general form in 1913, become an absurdity, and is inequitable in some respects as well.

"All that time (1913) a distinction was made between true furs and the skins of a group of domestic animals including Chinese dogs and goats, these skins being used principally for coats retailing at $12.50 to $17.50 and used by ranchers and teamsters in the northwest.

"Dog and goat skins were at that time imported principally in the form of mats or plates; mats consisting of a single *dressed* skin with pieces added to make it regular in outline and oblong in form; plates consisting of two or more *dressed* skins sewn together in an oblong form. Then as now this sewing was crude and had to be ripped out and resewn to meet our standards, but there is an advantage in importing the skins in this form, rather than separately, as they are uniform in size while individual skins are not.

"*Plates, mats, and crosses of dog, goat, or kid skins are not further advanced than dressing and dyeing. They are not as far advanced as dyeing in fact.* They cannot be used for manufacturing purposes until the seams have been resewn, often after the skins have been completely ripped apart. In the case of crosses of goat and kid, which for ages past the Chinese have made in his form, the arms of the cross must be cut off and seams ripped out and resewn. Hence there is no reason whatever for regarding goat and kid crosses as 'Further advanced than dyeing' and the duty on them as well as on dog, goat, and kid plates and mats should not be higher than that on dressed furs, if they are merely dressed, or than that on dyed furs if they are dressed and dyed. They are not ordinarily imported dyed.

"Acts of 1913 and 1922 Permitted Importation of Plates and Mats of Dog and Goat at Lower Rate Than Dressed Skins

"While fixing the tariff in 1913 on these mats and plates of *dressed* dog and goat skins and at 10 percent as against 40 per cent for true furs dressed and partially manufactured, Congress made no exception of dog or goat skins dressed but not sewn together, but deliberately left such skins to come in as dressed furs at 30 per cent, though making no mention thereof in the act.

"This was done in the interest of certain American dressers who were then dressing raw Chinese dog and goat skins, and were hopeful of eventually developing their methods and processes to a point at which they could compete on a quality basis in spite of higher cost of labor. It was felt that with sufficient encouragement these concerns would eventually develop a satisfactory method of dressing these skins.

"It is greatly to be desired that such a process should be developed here as American dealers would willingly pay three or four times as much for dressing if they could have dogs, especially, dressed here, thereby avoiding a delay of sev-

of itself and others, with the Committee on Ways and Means of the House of Representatives, while the committee was holding hearings upon the bill which matured as the Tariff Act of 1930. See Tariff Readjustment—1929, Hearings before the Committee on Ways and Means, House of Representatives, Seventieth Congress, page 7366 et seq.

We have intimated already that under the rulings of the Supreme Court and of this court we would not deem it proper to accept the brief presented at a committee hearing as an aid in construing the involved statute, even if we deemed the statute itself ambiguous. It certainly would be directly contrary to the rule stated in the Paramount Publix Corp. case, supra, to so accept it. A careful study of the report of the committee imparts no pertinent information, and apparently there was no discussion of the subject matter in either the House or Senate while the measure was being considered.

We, however, have studied the brief with some care and feel that some further comment about it reasonably may be expected. First, it should be said that para-

graph 1420 of the Tariff Act of 1922, 42 Stat. 858, like paragraph 348 of the 1913 Tariff Act, 38 Stat. 114, contained the following provision: " * * * plates and mats of dog and goat skins 10 per centum ad valorem."

The word "dressed" did not appear in the provision.

It was recommended in the brief that paragraph 1420 of the 1922 act be amended in different particulars, one being to provide (in lieu of the provision for "plates and mats of dog and goat skins, 10 per centum ad valorem") the following: "Dressed furs and skins, excepting silver or black fox, including plates, mats, and crosses of dressed dog, goat or kid skins, 25 per centum ad valorem."

The Committee on Ways and Means did not accept this language, but substituted the word "and" for the word "including."

The brief on behalf of the Government before us states that its acceptance of the language as submitted in the brief filed with the committee "would have amounted to a legislative pronouncement that a plate was a fur or skin."

eral months in getting the goods on the market and also avoid the very high interest rates and risks attendant on tieing up capital in China for that length of time.

"Customs Rulings Nullify Congressional Intent

"The ink was hardly dry on the act of 1913 when the customs authorities ruled that Congress could not have intended *dressed* dog and goat skins to come in at 30 per cent and the same skins sewn together in mats or plates at only 10 per cent, hence *dressed* dog or goat, as individual skins should come in at the same rate specified for plates or mats.

"The infant industry of dog and goat dressing was promptly deprived of the protection given it by Congress and has made no material progress since then.

"Customs Court Ruling Restores Protection on Dog and Goat Skins Dressed, But Under the Impression That Congress Did Not Say What It Meant

"This protection was not restored until 1927 when the Customs Court rendered a decision that kid skins are entitled to the same tariff rate as goat skins, ruled that

neither are entitled to 10 per cent and that the Customs Bureau had erred in letting *dressed* dog and goat skins in during the past 13 years at 10 per cent. The court held that it could not put into the act a meaning not expressed in the language of the act, even though the resulting situation seemed absurd.

"In 1913 Congress had also provided 15 per cent for garments made of dog or goat skins.

"Since 1913 a great change has taken place in the standard of living of even ranchers and teamsters. The $12.50 coat has vanished. Dog, goat and kid skins are used for more expensive garments and for trimming on expensive cloth coats. Certain kid skin coats dutiable under the present act at 15 per cent are retailed at several hundred dollars.

"There is absolutely no reason why *dressed* dog, goat, or kid skins, either singly or in the form of mats, plates, or crosses should pay less duty than any other dressed fur skins, namely, 25 per cent under the present act. We recommend that the act be amended to meet this condition." [Italics supplied by dissenting judge.]

So far as we can determine, that may have been what the fur industry desired. We note from the introductory portion of the brief not quoted, supra, that the association which filed it stated that it comprised some thirteen or fourteen hundred members throughout the United States; that practically all local or group associations in the fur trade were represented on its governing board; that as an established trade custom it had general authority to speak for the fur industry in all its branches, but further stated: "However, in the matter of the tariff the interests of one group may, and often do, conflict with the interests of other groups. Each group desires greatly that its own raw material should be admitted at the lowest possible rate of duty, and that its finished product should receive the utmost protection. It was necessary, therefore, to obtain especial authority from the major groups in the industry and we present credentials from these major groups, namely, importers, exporters, and dealers in raw and dressed furs and skins, dressers and dyers of furs and skins, and wholesale manufacturers of furs. We take it upon ourselves to speak for retailers, as they are represented in the membership of the National Association of the Fur Industry and on our governing board."

It is fair to assume that in conferring with the various parties, or as a result of such conferences, the language submitted to the committee was chosen carefully. It is interesting to note that the brief declared:

"Our purpose is to avoid any tariff increase that would tend to raise the price of our product to the public. This is not as it may seem, entirely altruistic. It is essential that we keep our costs down in order to avoid undue sales resistance."

In the brief for appellee an argument is presented reading in part:

"Even if the brief of the Fur Industry be accepted as evidence of legislative history, it certainly does not support the conclusions draw therefrom in the dissenting opinion. * * * Whether or not the Association did regard the 'China process' as dressing under American standards cannot possibly be ascertained from a dispassionate reading of that brief.

"The avowed reason for filing the brief was to demonstrate to Congress that there *was no logical reason for a different tariff treatment of dog, goat and kid skins when they were temporarily sewn together, than when they were imported as individual skins.* The reason and need for this demonstration was because the Tariff Act of 1922 provided for individual dressed skins of all kinds at 25%; for plates and mats of dog or goat skin at 10%; for crosses (held in the case of kid skins to be dutiable as plates of goat in T.D. 42644), and linings at 40%; and that this resulted in dressed dog, goat and kid skins sewed together in the form of plates or mats taking a lower rate of duty than was applicable to the same skins *dressed* and imported individually." [Italics quoted.]

We do not find in the Fur Industry brief any express "avowal" that the reason for filing it was as stated in the italicised phraseology quoted, and we take that to be the interpretation placed upon it by counsel for appellee.

We do not undertake to interpret the language. The brief seems capable of different interpretations and it might be argued with some plausibility that it in itself is ambiguous.

The brief gave no description of the processes which were applied to the skins in China, and the description of the formation of the plate does not, as we view it, establish that the plates were dressed according to United States standards.

We deem it unnecessary to lengthen this opinion by further discussion of legislative history.

For the reasons stated the judgment of the United States Customs Court is affirmed.

JOHNSON, J., dissents.