UNITED STATES of America

v.

Simon SILVERMAN, a/k/a Sid Taylor, et al.

No. 9111.

United States District Court
D. Connecticut, Criminal Division.

July 6, 1955.

**822**

Simon S. Cohen, U. S. Atty., Dist. of Conn., Francis J. McNamara, Jr., Asst. U. S. Atty., Dist. of Conn., New Haven, Conn., James A. Cronin, Jr., Sp. Asst. to the Atty. Gen., for plaintiff.

Catherine G. Roraback, New Haven, Conn., Samuel Gruber, Stamford, Conn., Frank J. Donner, New York City, for defendants.

ANDERSON, District Judge.

The defendants in this action were indicted by the Grand Jury on March 4, 1955, for violation of the Smith Act, 18 U.S.C.A. § 2385, in that they conspired unlawfully, wilfully and knowingly to advocate and teach the duty and necessity of overthrowing and destroying the Government of the United States by force and violence with the intent to cause said overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit; and also in that they conspired unlawfully, wilfully and knowingly to organize and help to organize the Communist Party of the United States of America, a society, group and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence with the intent to cause the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit. The indictment adds certain specifications concerning the conspiracy and lists seventeen overt acts connected therewith.

The defendants in this action are the same as those named in a former action in this court, Criminal No. 8991, 129 F.Supp. 496, the indictment in which was dismissed by the court on February 23, 1955, with the exception of Martha Stone, also known as Mrs. Emil Asher, who is a defendant in the present action but who was not a defendant in Criminal No. 8991. The indictment is the same as that in the former case, No. 8991, except that additional persons, not defendants, have been named as co-conspirators and the overt acts include allegations as to Martha Stone and are set out in a different numerical order.

The present indictment returned March 4, 1955, is attacked by the following motions filed by the defendants:

(a) For inspection of Grand Jury minutes, hearing and other relief

(b) Challenging the array, for inspection of jury commission's records and further relief

(c) To sever

(d) To dismiss indictment

(e) To strike overt act number one

(f) For a bill of particulars

(g) To dismiss the indictment because of Communist Control Act of 1954

The defendants have also made the following preliminary motions:

(h) To return seized documents

(i) To produce documentary evidence before trial under Rule 17(c), Fed.R.Crim.P. [18 U.S.C.A.].

(j) For discovery and inspection of documentary evidence before trial, under Rule 16, Fed.R.Crim.P.

These motions have all been heard and briefs have been filed on them by all of the parties. The motions will be discussed in the order in which they appear above.

(a) Motion for Inspection of Grand Jury Minutes, Hearing and Other Relief

The defendants assert that the Grand Jury could not have deliberated a sufficient length of time to consider adequately the evidence in the case and properly fulfill the duties which the law imposes upon it. It appears that between March 2, 1955, at about 11:30 A. M., when the Grand Jury was impanelled and charged and March 4, 1955, at 10:30 A.M. when the indictment was returned,

the Grand Jury deliberated on this case for a little over eleven hours. The defendants conceded that this alone might not be enough to warrant an inspection of the Grand Jury minutes and they, therefore, sought to examine the foreman of the Grand Jury by oral examination or interrogatories to find out the kind of evidence presented to the Grand Jury, the extent to which the Grand Jury inquired into the interest of the witnesses, if any, the length of time consumed in hearing evidence, the length of time consumed in deliberation and other similar matters. Without giving any reason for it or any offer of proof to support their contention, they claim that such an examination would produce evidence to justify an inspection of the Grand Jury minutes. They admit they have no real reason to ask for an inspection of the minutes, nor have they any basis at all, let alone a reasonable one, for a hearing to examine the foreman of the Grand Jury and perhaps others. In effect they say that if they can examine the periphery of the Grand Jury proceedings, they may be able to come up with an adequate reason. The court cannot authorize such a speculative foray, prompted solely by hope and grounded solely on suspicion and surmise. The subpoena of the foreman of the Grand Jury issued for this purpose was quashed and the motion is denied. U. S. v. Remington, 2 Cir., 191 F.2d 246; Cox v. Vaught, 10 Cir., 52 F.2d 562; and U. S. v. Fujimoto, D.C., 102 F.Supp. 890, 896.

### (b) Motion Challenging The Array, for Inspection of Jury Commission Records and Further Relief

In the former case, No. 8991, the motion challenging the array was granted and the indictment was dismissed because the jury commissioners failed to apply the statutory qualifications in making up the jury list. Reference is made to the general discussion of the applications of the statutory standards and the methods of selecting jurors in that case, U. S. v. Silverman, D.C., 129 F.Supp. 496, 507. In the present case the Grand Jury was drawn from a new jury list made up by a new jury commission which took office on January 1, 1955. The commissioners are the Clerk of the Court, Gilbert C. Earl, who prior to his appointment as Clerk on January 1, 1955, was for a long time chief deputy clerk of this court, and Addison Mueller, who for many years has been a Professor at the Yale University School of Law. At the hearing on this motion they described their method of making up the jury list as follows:

### I

(a) Each member of the Jury Commission selects from those areas of the District of Connecticut prescribed by Court Order of September 7, 1954, a number of citizens from a variety of backgrounds whom he has reason to believe have a wide acquaintance in their respective communities and are esteemed therein as persons of good character, approved integrity, sound judgment and fair education. The function of these citizens—hereinafter called "suggesters" —is to furnish to the Jury Commission the names of residents of their communities who, in their considered opinions, are qualified for jury service.

(b) An index card is prepared for each suggester.

(c) The Jury Commissioners confer on their choices of suggesters. In this conference they exchange information on the qualifications of the suggesters selected by each; they eliminate duplications of names; and they survey the entire list to minimize the possibility that in their selection of suggesters they have inadvertently discriminated against any significant area or racial, religious, occupational or environmental group. When a suggester has been approved by both Commissioners, his index card is initialled by them.

(d) A letter is sent to each suggester. This letter outlines in detail the points that the suggester must consider in

making up his list of proposed jurors. This letter reads as follows:

"Dear

"The right to a trial by jury is one of our most cherished democratic traditions. But this right can be a meaningful one only if jurors are capable and impartial and are selected without regard to race, color, creed, politics or station in life. We, as newly appointed jury commissioners for the Federal Court in New Haven, are charged with the duty of getting jurors of this kind. And because such jurors should be drawn from all parts of the large area served by the New Haven Court and should represent all walks of life and points of view, we need the help of conscientious and well-informed citizens in properly discharging this obligation. That is why we are calling on you to suggest the names of men and women in your community who, in your judgment, would make qualified jurors.

"In making your suggestions, please keep the following statutory requirements in mind. To be qualified for jury duty, a man or woman must be:

"1. Twenty-five years of age or over;

"2. A present resident of Connecticut who is a qualified voter;

"3. Free from mental or physical infirmities which would interfere with the efficient performance of jury duty;

"4. Free from ever having been convicted of a crime punishable by imprisonment for more than one year;

"5. Able to read, write, speak and understand the English language, and

"6. Esteemed in his community as a person of good character, approved integrity, sound judgment and fair education. In determining 'esteem,' please keep in mind that this does not require wide public recognition or high place. Integrity, intelligence, sound judgment, a sense of responsibility—in short, all those qualities of a first-class citizen which cause a man to be esteemed by his fellows—are as often to be found among the unheralded as among the prominent.

"It is because we feel that you are in a position to know citizens who measure up to all of these standards that we are calling on you. For your convenience, we are enclosing a sheet on which to list your candidates. In making up this list, we ask that you make a conscious effort to include men and women from a variety of backgrounds and occupations so as to give us, as nearly as possible, a representative cross-section of your community. Please list up to twenty names on this sheet, sign it, and return it in the enclosed envelope which needs no stamp. Your suggestions will, of course, be kept in strictest confidence by us. And, though we do not want you to act hastily in the important task of making up your list, we ask that you return it promptly.

"Believe us, your help is urgently needed. Your only reward will be the knowledge that you have made an important contribution to the better functioning of a vital democratic institution. We are sure that for you this will be reward enough.

"Most sincerely,
"Jury Commissioners"

Enclosed with this letter is a ruled form and a self-addressed envelope requiring no postage for use by the suggester in submitting his list of proposed jurors to the Jury Commission.

(e) The date on which the above letter and documents are sent to the suggester is entered on his index card.

## II

(a) When a list of names and addresses is returned by a suggester, such list is stamped as to the date received.

The Jury Commissioners thereafter examine each list and when satisfied of its completeness as to date, signature, etc., they place thereon their initials and the date of such examination.

(b) A file folder is then prepared for the suggester's return. Such folders are kept in a filing cabinet marked "Suggesters."

(c) The date on which the suggesters return was received is marked on his index card.

(d) A letter is sent to the suggester thanking him for his cooperation.

### III

(a) A form letter from the Judges of this Court is sent to each person whose name appears on a suggester's list, together with a questionnaire designed to elicit information for use by the Jury Commissioners in their determination of whether or not the suggested person is eligible to serve as a Grand or Petit Juror. A self-addressed envelope which requires no postage is also enclosed for use by each prospective juror in returning his or her questionnaire. The letter reads as follows:

"These questions are designed for a preliminary determination of your suitability for the list of Grand Jurors and Petit Jurors in this court. Such jury service, if eventually required, will be in the Post Office Building, either at Hartford or New Haven, whichever is nearer to your residence. Generally, in this court, service as Grand Juror requires only two or three days scattered through a session of some months, and service as Petit Juror requires attendance seldom for more than four days a week at intervals over a period of two or three months. And the number of names on our jury list is so great that it well may be that your name will never be drawn.

"This is not a summons. By promptly answering and returning these questions in the enclosed envelope which requires no postage, you will make it unnecessary for you to attend court until you are listed and drawn: otherwise you may be summoned under penalty of the law to report in person for examination as to your qualifications by the Jury Commissioner. Please return the questionnaire promptly.

"The institution of the Jury is a chief bulwark of American democracy. Service as a juror is both a privilege and a responsibility for every American citizen. If listed and drawn for service, you will receive advance notice as to when to report and will be entitled to a jury fee of $7.00 for each day of attendance, and a mileage fee as provided by law."

The questionnaire asks the following questions:

1. Name
2. Residence Address
3. Business Address
4. (Residence Phone) (Business Phone)
5. Preferred address for receiving mail
6. Present occupation, or business, and and name and address of present employer, if any
7. Other occupations, if any, during last 10 years
8. Age —— years. Sex, male or female (circle which)
9. Place of Birth
10. Are you a citizen of the United States
11. Have you any permanent disability impairing your capacity to serve as a juror, including impaired eyesight or hearing
 If so, state its nature and extent
12. Have you had prior jury service
 If so, state date and court in which you *last* served

13. Have you ever been convicted of any offense in any state or Federal court

 If so, give details. (An affirmative answer to this question will be treated as confidential).

14. Have you ever been excused from or rejected for jury service

 If so, in what court and for what reasons

15. List any public office, Federal, state or local, which you now hold other than as stated under question 6

16. If naturalized, state date and court in which naturalized

17. Education (indicate number of years of grade school, high school, and college * * *)

18. Can you read, write, and understand English

19. Are you a qualified voter

 If so, where are you eligible to vote

20. How long have you lived at your present address

21. How long have you lived in this state

22. If married, what is the occupation of your husband or wife

(b) An index card is prepared for the name of each person submitted by the suggester at the time the letter and questionnaire are mailed. This card includes the name and address of each such person, the suggester's initials, and the date the questionnaire was mailed. Such cards are kept in a file drawer labeled "Names of Prospective Jurors."

### IV

(a) When the questionnaire is returned by a prospective juror, it is file-stamped to show the date received. This date is inserted on the juror's index card. If the spelling of the name or the address on the questionnaire is different from that appearing on the index card, the index card is corrected—either by making a completely new index card or by altering the old one to coincide with the questionnaire.

### V

(a) The questionnaire of each prospective juror is examined by both Jury Commissioners.

(b) If any significant question has been left unanswered, a letter is addressed to such prospective juror covering the return of the questionnaire for completion.

(c) In those instances where the Jury Commissioners consider that more information is desirable in conjunction with an answer given to any question of the questionnaire (such as, for example, question 11 relating to permanent disability impairing the person's capacity to serve as a juror), a special letter requesting such additional information is sent to the prospective juror. In those instances where the Commissioners feel that correspondence with the prospective juror is not well designed to elicit the necessary information, either one or both of them will write to other sources or make telephonic or personal investigations.

(d) If the initial answer to question 12 leaves a doubt as to whether the prospective juror is temporarily disqualified under Section 2376c Conn.Gen.Stats., Conn.Supp.1953, the Jury Commissioners address a letter to such prospective juror asking for the necessary additional information.

(e) The Jury Commissioners meet in conference and, after considering all of the information available with respect to each prospective juror, determine whether or not such prospective juror meets all of the statutory standards for inclusion in the jury array. If he or she is accepted for jury service, it is so indicated by the Jury Commissioners on the face of the questionnaire and the date of the acceptance is entered on the juror's index card. If he or she is rejected, that fact and the reason for rejection is indicated on the face of the questionnaire and the date of rejection is entered on the juror's index card.

(f) Separate files are maintained for the questionnaires of those who are ac-

cepted for jury service and those who are rejected. Corresponding indices are kept separately.

## VI

When directed by a Judge of this court to establish a new jury array or to augment the existing array, the Jury Commissioners:

(a) Have a separate card, called "jury cards," prepared for each accepted juror containing the name and address of each such juror.

(b) Have a jury list prepared to correspond with the jury cards.

(c) Check the file of jury cards against the jury list to insure the accuracy of that list and its numerical sufficiency in terms of the minimum number of names required by the Judge's directing order.

(d) Take the jury box and jury cards to the courtroom and there, in the presence of witnesses and with the court reporter recording the proceedings, fill the jury box by alternately placing jury cards into said box until all cards have been so placed.

■ A hearing was held on the defendants' motion and the jury commissioners testified under examination by counsel for the defendants and for the Government and by the court as to the method used in selecting the jury list from which the Grand Jury which returned the indictment in this case was drawn. The system above described was followed. The defendants presented no evidence to show that a different system was followed or that the commission failed in any way to fulfill the requirements of the law in the performance of their duties. The method used by the commission was well adapted to carry out the letter and spirit of the law and I cannot find that the commissioners committed any error in making up the jury list.

The motions are denied.

### (c) Motion to Sever

Although another defendant, Martha Stone, has been added to those indicted in the former case, No. 8991, the same reasoning applies to the present eight defendants as applied to the seven in the former indictment. U. S. v. Silverman, supra, 129 F.Supp. at page 500. The discussion of the motion to sever in that memorandum is incorporated by reference and is made determinative of the motion in the present case.

### (d) and (e) Motion to Dismiss Indictment and Strike Overt Act No. 1

■ These motions are also denied for the reasons given in denying similar motions in case No. 8991, U. S. v. Silverman, supra, 129 F.Supp. at pages 500–503. With regard to the discussion therein of paragraphs four and five of the motion to dismiss, which deal with the application of the three year statute of limitations and the repeal of the conspiracy section of the Smith Act, the language used did not mean to convey the impression that there could be a conviction of any of these defendants absent allegation and proof of a necessary overt act. The conspiracy, as set out in the indictment, is a continuing one from 1945 to 1955. The statutory change in 1948 simply has the effect of requiring the Government to allege and prove that at sometime during the existence of the conspiracy one or more of the conspirators performed an "act to effect the object of the conspiracy." It should also be noted that Overt Act No. 1 of the present indictment is the same as Overt Act No. 17 of the former indictment.

### (f) Motion for a Bill of Particulars

■ The indictment is sufficiently specific. The principal objection advanced by the defendants concerns the use by the Grand Jury of such general terms as "divers other persons to the Grand Jury unknown", "place or places elsewhere" and "other and further things" done by the conspirators. These general terms, however, follow allegations of specific persons, places and things and presumably refer to those

which could not be further specified. As was stated in connection with the motion for a bill of particulars made in connection with the former indictment, No. 8991, the present indictment under the Federal Constitution and laws must be sufficient to advise the defendants of the nature and cause of the accusation in order that they may meet it and prepare for trial, and after judgment, be able to plead the record and judgment in bar of a further prosecution for the same offense. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; and United States v. Kushner, 2 Cir., 135 F.2d 668.

The indictment in this case amply fulfills these requirements.

The motion for a bill of particulars is denied.

### (g) Motion to Dismiss Because of the Communist Control Act of 1954

The defendants claim that Public Law 637—83rd Congress (2d. Session), known as the Communist Control Act, now Title 50 U.S.C.A. §§ 841–844, which came into effect August 24, 1954, over six months prior to the indictment in this case, had far reaching effects upon the Smith Act, Title 18 U.S.C.A. Section 2385 and prosecutions brought under it. They assert that it repealed the Smith Act, or if it did not repeal it, at least it amended it so as to render it unconstitutional because it is a bill of attainder and because it violates the due process clause of the Fifth Amendment to the Constitution of the United States by taking from the jury the power to find the basic elements of the offense alleged, and by denying to the defendants the right and freedom to prepare and present their defense, to gather evidence, confer with witnesses and have witnesses testify on their behalf. They claim also that it violates the Sixth Amendment by depriving them of the right to counsel; that it takes from the jury the freedom to reach an independent and impartial verdict and that it takes away from the court its freedom and power to decide whether or not a clear and present danger existed at the time the indictment was returned.

The Communist Control Act does not repeal the Smith Act. It does not repeal it expressly, for it no where mentions or refers to the Smith Act; nor does it repeal it by implication.

A statute is not to be deemed repealed or amended merely by the enactment of another statute on the same subject and courts will not enlarge the meaning of one act in order to hold that it repeals another by implication, nor will they adopt an interpretation of repeal unless it is inevitable, or unless the conflict, inconsistency or repugnancy in the two statutes is plain, unavoidable, and irreconcilable.

"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. * * * The intention of the legislature to repeal 'must be clear and manifest'. * * * It is not sufficient * * * 'to establish that subsequent laws cover some or even all of the cases provided for by (the prior act); for they may be merely affirmative, or cumulative, or auxiliary.' There must be 'a positive repugnancy between the provisions of the new law and those of the old.'" United States v. Borden Co., 1939, 308 U.S. 188, at page 198, 60 S.Ct. 182, 188, 84 L.Ed. 181. Also see, Rosenberg v. United States, 1953, 346 U.S. 273, at page 295, 73 S.Ct. 1152, 97 L.Ed. 1607.

The purpose of the Smith Act is to subject to the penalties of fine or imprisonment or both, persons who, through one described means or another, advocate the overthrow of the Government of the United States by force and violence. The Communist Control Act, section 3, outlaws the Communist Party of the United States and any successors to it as a political party by depriving it of the right to nominate and place on

the ballots the names of its candidates in elections to public office and of such other rights, privileges and immunities as by law, tradition and custom are the usual attributes of political parties in this country to the extent to which it is within the constitutional powers of Congress thus to abolish or delimit such interests. It also, §§ 4 and 5, implements the Internal Security Act, Title 50 U.S. C.A. Chapter 23, by providing an alternative to the proceedings before the Subversive Activities Control Board, Internal Security Act, §§ 791 and 792, to determine whether or not an individual "knowingly and willfully becomes or remains a member of (1) the Communist Party or (2) any other organization having for one of its purposes or objectives the establishment, control conduct, seizure, or overthrow of the Government of the United States, or the government of any State or political subdivision thereof, by the use of force or violence, with knowledge of the purpose or objective of such organization." Communist Control Act, §§ 4 and 5. This alternative is, in effect, additional machinery whereby the issue of whether or not an individual knowingly and wilfully becomes or remains such a member of (1) or (2), above, may be determined in the United States District Courts where a verdict and judgment of "guilty" will have the same force and effect under the Internal Security Act as a determination by the Subversive Activities Control Board that the individual is a member of a Communist-action organization. The consequences which flow from such a verdict and judgment are not a fine or imprisonment or both as would follow conviction under the Smith Act, but are the immediate imposition of the sanctions provided by the Internal Security Act such as the prohibition against seeking, accepting or holding any non-elective office or employment under the United States or employment in any defense facility without disclosing that he is a member of such an organization and such as the denial of the right to a passport and the other disabilities set forth in the Act, besides which the individual found guilty would, under the Act, be required to register with the Attorney General within the time specified.

■ In broad outline and purpose the Smith Act deals with the direct promotion of treason and sedition, while the Communist Control Act, integrated with the Internal Security Act, deals with the danger to the security of the United States which results from permitting certain, generally described individuals to occupy positions of trust, advantage or observation while they are hostile to the preservation of the Government of the United States and are supporting its enemies and with the danger which results from permitting the existence of a political organization which spawns such individuals and promotes such objectives. While these two acts are allied in that they are designed to protect the United States from its internal and external enemies and while in some instances the same individuals might be affected by both acts, there is nothing to warrant the conclusion that the Communist Control Act repealed the Smith Act.

■■ With regard to the defendants' claim that the Communist Control Act amends the Smith Act, it certainly does not do so expressly nor can I find that there is any amendment by implication. There is nothing irreconcilable about them. The foregoing discussion of the different functions and purposes of the two acts relative to the claim of repeal is applicable to the claim of amendment by implication. The Communist Control Act may be somewhat in aid of the Smith Act but no more so than a statute against pick-pocketing is in aid of a statute against robbery. Amendments by implication are not favored and the courts will, if possible, give effect to all statutes covering, in part, the same subject matter where they are not absolutely irreconcilable. Brooklyn & Richmond Ferry Co. v. U. S., 2 Cir., 167 F.2d 330;

and U. S. v. 24 Cans Containing Butter, 5 Cir., 148 F.2d 365, certiorari denied 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 450.

In support of their contention that the Communist Control Act amends the Smith Act, the defendants lay great stress upon the statements of individual senators on the floor of the Senate in the course of the passage of the Communist Control Act as manifesting an intention that it constitutes such an amendment. A study of the Congressional Record discloses a variety of individual opinions expressed in the Senate. The legislative history of the act, the alterations made in the bill by the Conference Committee and the provisions of the act itself as finally passed, however, show no intention of repealing or amending the Smith Act, although statements of some individual senators may indicate otherwise.

In United States v. Kung Chen Fur Corp., 188 F.2d 577, at page 584, 38 C.C. P.A., Patent, 107, the court, quoting from Aldridge v. Williams, 3 How. 9, 44 U.S. 9, 11 L.Ed. 469, stated:

"' * * * the judgment of the court cannot, in any degree, be influenced by the construction placed upon it [the statute] by individual members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed.' "

The defendants' claims based upon unconstitutionality and violation or deprivation of constitutional rights arise out of the claimed marriage of the Smith Act and the Communist Control Act through amendment by implication which has just been found not to exist. Some further discussion, however, is indicated particularly with respect to the sections of the Communist Control Act not heretofore mentioned. The defendants argue that Section 2 of the Communist Control Act entitled "Findings of Fact" make a legislative finding that the Communist Party constitutes a conspiracy to overthrow the Government of the United States by force and violence, and that the Communist Party's existence is a clear, present and continuing danger to the security of the United States thus relieving the Government in the prosecution of a case under the Smith Act of the burden of proving these essential elements of the crime and preventing the defendants from rebutting them. This position is not tenable. The "Findings of Fact" were made for and in connection with the Communist Control Act and cannot be picked from that act and attached to the Smith Act, a separate and distinct statute enacted fourteen years before. Even as applied to the Communist Control Act itself the accepted concept as to the purpose of legislative findings and the weight and force to be accorded them falls short of what the defendants claim the effect to be. Legislative findings are an aid to the other branches of the Government, principally the judicial branch, in disclosing the conditions and circumstances which produce the statute, the needs in response to which the legislation was passed and why Congress feels it is justified, particularly in the light of constitutional considerations. While the courts give them great weight they are not conclusive. American Communications Association v. Douds, 339 U.S. 382, 400, 70 S.Ct. 674, 94 L.Ed. 925; and Block v. Hirsh, 256 U.S. 135, 154, 41 S.Ct. 458, 65 L.Ed. 865.

In speaking of the statutory characterization of a product as harmful in a statute prohibiting the product's shipment in interstate commerce, the Supreme Court said:

"There is no need to consider it here as more than a declaration of

the legislative findings deemed to support and justify the action taken as a constitutional exertion of the legislative power, aiding informed judicial review, as do the reports of legislative committees, by revealing the rationale of the legislation." U. S. v. Carolene Products Co., 304 U.S. 144, at page 152, 58 S.Ct. 778, at page 783, 82 L.Ed. 1234.

The defendants rely upon Communist Party of United States v. Subversive Activities Control Board, D.C.Cir., 223 F.2d 531, in support of their contention that the findings are binding upon the court in all proceedings in which the nature of the Communist Party is in issue. I cannot agree that it has any such sweeping and all pervading effect. The Court of Appeals in the Communist Party case relied upon Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911. In the Galvan case, however, the Supreme Court was concerned with the constitutionality of Section 22 of the Internal Security Act and relied largely upon the Congressional findings in that act to uphold the constitutionality of the section. The findings were not used as establishing essential elements of the case or to relieve the Government from the burden of proving any of those elements. The distinction lies in the purpose for which the findings are used. For the purpose of considering the constitutionality of the statute the legislative finding is entitled to great weight and may be determinative in upholding it. For the purpose of applying the statute in particular prosecutions against individual defendants a legislative finding may, at best, be merely admissible on an issue to which it is pertinent such as clear and present danger. The Galvan case certainly cannot be taken to have enunciated a rule whereby the findings in the Communist Control Act are a substitute for and fully supply necessary elements of the Government's proof in a prosecution under a different, independent and separate act such as the Smith Act. In the present case the Government has the burden of proving all of the essential elements of the offense charged, just as if the Communist Control Act had never been passed, and the defendants will have a full and ample opportunity to rebut the Government's proof. Nor is the finding any more binding on the court on the issue of clear and present danger. This too must be proved by the Government in the usual way and in the measure required and the defendants will be given the chance to meet it.

With regard to Section 5 of the Communist Control Act the defendants' contention that proof of one or more of the thirteen specified classes or kinds of evidence therein described creates a presumption of guilt goes beyond the provisions and purposes of the section, which concerns the admissibility of certain evidence and requires the court to instruct the jury concerning it. In any event the provisions of this section have no application in the trial of a case under the Smith Act.

The claim of the defendants is that the Communist Control Act by its affect on the Smith Act deprives them of due process under the Fifth Amendment. As it neither repeals nor amends the Smith Act this result does not follow for that reason. Standing alone the Communist Control Act does not take away from the defendants their right and freedom to prepare their defenses, to gather evidence from third persons, to confer with witnesses and obtain persons willing to testify in connection with the present charge brought under the Smith Act. Even though the period covered by the indictment in the present case extends several months beyond August 24, 1954, the effective date of the Communist Control Act, the defendants will not be prejudiced in their defense as to matters which took place before August 24, 1954, for the reasons stated in the former case concerning the same motion, U. S. v. Silverman, supra, 129 F.Supp. at page 505. As to events subsequent to the date of August 24, 1954, they may be hampered by the Communist Control Act only in conferring with those witnesses

and getting those individuals to testify who have knowingly and wilfully become or remained members of the proscribed organizations since August 24, 1954. The fact that persons to whom the defendants look to assist in their defense by conference or testimony may choose to remain obscure because they may come within the requirements of another statute does not render a prosecution under the Smith Act unconstitutional. Nor is there anything in the Communist Control Act to prevent defendants' counsel from fully representing them in the preparation and conduct of their defense with complete protection of the rights guaranteed by the Sixth Amendment.

 The defendants' claim that the Smith Act as amended by the Communist Control Act creates a bill of attainder is disposed of by the conclusion already stated that the Smith Act is not amended by the Communist Control Act. A bill of attainder is a legislative act that applies either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial. U. S. v. Lovett, 328 U.S. 303, at page 315, 66 S.Ct. 1073, 90 L.Ed. 1252. The Communist Control Act has done nothing to eliminate or curtail any part of the trial of the present case. The defendants are entitled to a full judicial trial on all of its issues. A very thorough and interesting discussion of the attainder question, as well as the other aspects of the Communist Control Act, is in the Yale Law Journal, Vol. 64, page 712.

 Finally the defendants assert that the passage and existence of the Communist Control Act has created a climate or atmosphere so unfavorable to them that they cannot receive a fair trial because it will be impossible to procure an impartial jury. They urge that for this reason the indictment should be dismissed or the proceeding should be stayed as long as the provisions of the Communist Control Act are operative. As was stated in the former case, U. S. v.

Silverman, supra, 129 F.Supp. at page 506, the passage of the act was the result of public opinion and sentiment, not the cause of it. It is not tenable to suppose that the passage of the act, in and of itself, engendered in the general public feelings of more intense hostility toward Communism than existed before its passage. With regard to the effect of the attitude of the public, Judge Hand's opinion in the Dennis case, U. S. v. Dennis, 2 Cir., 183 F.2d 201 at page 226, quoted by Judge Harlan in the Flynn case, U. S. v. Flynn, 2 Cir., 216 F.2d 354 at page 374, states the law of the matter. It says in part:

"'* * * Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have. * * *'"

With regard to a stay of proceedings Judge (now Justice) Harlan in sustaining the overruling of a similar motion in U. S. v. Flynn, 2 Cir., 216 F.2d 354 at page 374 said:

"Indeed, to hold otherwise would be tantamount to judicial proscription of the Smith Act, as applicable to members of the Communist Party, at least so long as the Internal Security Act of 1950 and the Communist Control Act of 1954 are on the books, since those statutes, which must presumably be taken as reflecting prevailing public opinion, find the Communist Party in the United States to be a conspiratorial instrument dedicated to the overthrow of the Government, if necessary by force and violence."

The motion to dismiss is denied.

(h), (i) and (j) Motions to Return Seized Documents: to Produce Under Rule 17(c), Fed.R.Crim.P.; and

for Discovery and Inspection Under Rule 16, Fed.R.Crim.P.

Through oral representations or agreement of counsel for the Government and counsel for the defendants it appears that:

The Government has represented that it does not have in its possession any books, papers, documents and objects belonging to the defendants other than that material seized at the time of their arrest and the defendants have accepted this reply to their request.

The Government has agreed to allow the defendants to inspect and copy all the books, papers, documents and objects obtained from the defendants at the time of their arrest.

The Government will allow the defendants to inspect and photostat the items which were seized from the defendants at the time of their arrest and which are still in the possession of the Government.

No material obtained by the Government from others by seizure or by process was presented to the Grand Jury, nor will any such material be presented on the trial of the instant case, and that it has no present knowledge that the Government is presently in possession of any items obtained from others by seizure or by process which would be "otherwise material to the defense of the defendants"; and the defendants have accepted this answer to their request.

The Government in response to the motion under Rule 17(c), has agreed to furnish a list of such documents, books, papers, and objects to the court and to the defendants. Counsel for the defendants then will cull out the particular items which they have reason to inspect and which they cannot easily procure themselves. The Government then will have an opportunity to consent or object to the production and inspection of the particular items. In the event of failure of counsel to agree, the court will hear the parties and issue such order as may then be deemed appropriate in the premises.