**UNITED STATES of America**
v.
**Simon SILVERMAN, a/k/a Sid Taylor, et al.**
**No. 8991.**

United States District Court,
D. Connecticut, Criminal Division.
Feb. 23, 1955.

Simon S. Cohen, U. S. Atty., Hartford, Conn., Francis J. McNamara, Jr., Asst. U. S. Atty., New Haven, Conn., James A. Cronin, Jr., Sp. Asst. to the Atty. Gen., for plaintiff.

Catherine G. Roraback, New Haven, Conn., Samuel Gruber, Stamford, Conn., Marvin D. Karp, Hartford, Conn., for defendants.

ANDERSON, District Judge.

The defendants in this action were indicted by the Grand Jury on June 4, 1954, for violation of the Smith Act, 18 U.S.C.A. § 2385, in that they conspired unlawfully, wilfully and knowingly to advocate and teach the duty and necessity of overthrowing and destroying the Government of the United States by force and violence with the intent to cause said overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit; and also in that they conspired unlawfully, wilfully and knowingly to organize and help to organize the Communist Party of the United States of America, a society, group and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States

500

by force and violence with the intent to cause the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit. The indictment adds certain specifications concerning the conspiracy and lists seventeen overt acts connected therewith.

The defendants have attacked the indictment through several motions which will be discussed and ruled upon seriatim:

### Motion to Sever

Each of the defendants seeks a severance of his trial from the trials of the other defendants. The defendants contend that unless a severance is granted the jury will be faced with an impossible task in attempting to sift and weigh the evidence applicable to a particular defendant but not admissible as to the others.

■ It is clear that the granting or denial of a severance is within the sound discretion of the court. Fed.R.Crim.P. 14, 18 U.S.C.A.; Dauer v. United States, 10 Cir., 189 F.2d 343, certiorari denied, 342 U.S. 898, 72 S.Ct. 232, 96 L.Ed. 672. In a conspiracy case where the charge against all the defendants may be largely proved by the same evidence and results from a similar series of acts, as is alleged here, a severance should not be granted except for strong and cogent reasons. United States v. Cohen, 2 Cir., 124 F.2d 164; United States v. Smith, 2 Cir., 112 F.2d 83; United States v. Mesarosh, D.C., 13 F.R.D. 180. Moreover, evidence relating to acts and declarations of all the conspirators in furtherance of the conspiracy are admissible against all whether or not each defendant is tried alone or jointly. United States v. Flynn, 2 Cir., 216 F.2d 354. I am not persuaded that the defendants are entitled to a severance in this case and the motion is, therefore, denied.

### Motion to Dismiss Indictment and Strike Overt Act No. 17

■ The first three paragraphs of the defendants' motion state several grounds of attack on the constitutionality of the Smith Act. There is, however, nothing in these motions or in the oral arguments or written memoranda of defendants' counsel which is persuasive to distinguish the present case in its constitutional aspects from Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, and United States v. Flynn, D.C., 103 F.Supp. 925, affirmed, 2 Cir., 1954, 216 F.2d 354. The finding of constitutionality of the Smith Act in these cases is determinative of the constitutional questions raised in this case. The motion on these grounds cannot, therefore, be sustained.

■ In paragraphs four and five of the motion to dismiss, the defendants raise questions based on the three year statute of limitations. They assert that the indictment is based in part upon Section 3 of the Smith Act, that this section was repealed September 1, 1948, and that no prosecution could be brought on it after August 31, 1951. They further ask the court to take judicial notice that the Communist Party of the United States was organized between July 26 and July 28, 1945,—several years prior to June 4, 1951, which is three years (i. e. the period of limitation) before the return of the indictment in the present case. From this they argue that the allegation in the indictment concerning "organizing * * * the Communist Party" is barred by the statute of limitations and, therefore, the whole indictment, which is in but one count, must fall.

■ Section 3 of the Smith Act was the conspiracy section of the Act. This section was repealed on June 24, 1948, the repeal to become effective September 1, 1948. On June 25, 1948, Section 371 of Title 18 U.S.C.A. was passed, effective September 1, 1948, as a general conspiracy statute and contained the same provisions in so far as this action is concerned as the repealed Section 3 of the Smith Act except that there was required the showing of overt acts and the maximum penalty attached became five years imprisonment instead of ten.

Therefore, as soon as the repeal of Section 3, the special conspiracy provision of the Smith Act, became effective, the general conspiracy statute Title 18 U.S. C.A. Section 371 came into operation as far as conspiracies to violate the Smith Act were concerned, substantially in the same manner and to the same extent as before. The reviser's notes show that the special conspiracy section of the Smith Act was omitted when the Smith Act was reenacted June 25, 1948, because this provision was fully taken care of by the general conspiracy statute. Historical and Revision Notes after Title 18 U.S.C.A. Section 371 and Section 2385. Incidentally the statute of limitations (Title 18 U.S.C.A. Section 582, 1940 ed.) applicable to Section 3 of the Smith Act was also repealed June 25, 1948, and the statute taking its place is now Title 18 U.S.C.A. Section 3282. Congress had no intention of removing from the laws a statutory provision making conspiracy to violate the Smith Act a crime. Nor did it do so. The history of the conspiracy section and the subsequent general conspiracy statute show them to have been a part of a revision and consolidation, the operative effect of which was to reenact and continue the former act so that all rights and liabilities under it were preserved and carried forward as if there had been no so-called "repeal." 50 Am.Jur. Section 533, Section 555.

The defendants seek to have the court now find that the Communist Party was organized at a National Convention in New York City between July 26 and July 28, 1945, and at no other time; and that the conspiracy in the indictment is based in substantial part upon the activities at this July, 1945, convention. If these things are true, then the statute of limitations might well apply to them. But the court has no right at this time to find they are true or that the charge is confined to so narrow a scope. The indictment alleges that from April 1, 1945, and "continuously thereafter up to and including the date of the filing of this indictment" the defendants conspired with each other and others (1) " * * * ad-

vocating and teaching the duty and necessity of overthrowing and destroying the Government of the United States by force and violence * * * " and (2) " * * * organizing and helping to organize, as the Communist Party * * * a group * * * who teach and advocate * * * the overthrow and destruction of the Government of the United States by force and violence * * *." These allegations, covering a span of more than nine years, present a charge of "organizing" which goes considerably beyond the confines of three days in July, 1945. The court at this stage of proceedings cannot adopt as a matter of law so narrow a definition of "organize" as to restrict it to activities at a National Convention of the Communist Party in July of 1945.

■■ For the purpose of a motion to dismiss, the court must take the facts from the allegations of the indictment and not from the arguments of the parties. The indictment presents a claim of a continuing conspiracy; overt acts, alleged to have been committed by the various defendants, run from May 3, 1952, the earliest, to December 21, 1953, the last. The statute of limitations runs from the time of the last overt act. United States v. Johnson, 3 Cir., 165 F. 2d 42, certiorari denied, 332 U.S. 852, 68 S.Ct. 355, 92 L.Ed. 421. Proof may show that the defendants were not conspiring to organize or help to organize from April 1, 1945, to the date of the indictment, but that is something to be dealt with at the trial and not on a preliminary motion such as this.

■ Paragraph six of the defendants' motion to dismiss states several reasons why they believe the indictment is legally insufficient in failing to allege essential elements of the offense charged. These objections fall generally into three groups. First, it is claimed that the indictment does not specifically allege actions or speech on the part of any one of the defendants which was ordinarily and reasonably calculated to incite to the illegal actions charged; second, that there are no facts alleged showing that the

conspiracy charged or conditions connected therewith created a clear and present danger to the Government of the United States; and third, that there are no facts alleged that the conspiracy charged would probably bring about, or that the defendants had the power to bring about, the overthrow or attempted overthrow of the United States Government.

Rule 7(c) of the Federal Rules of Criminal Procedure provides that "The indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The federal cases have repeatedly stated that "the object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one be had." United States v. Cruikshank et al., 92 U.S. 542, 558, 23 L.Ed. 588.

■ I am satisfied that the indictment in the present case adequately fulfills these purposes. It is not necessary that the indictment state in so many words that the acts or speech connected with the conspiracy charged were such as were ordinarily and reasonably calculated to incite to illegal actions. These words are a descriptive guide in connection with the weighing of the evidence which may be included in the court's charge to the jury to assist them in determining whether or not the acts alleged in the indictment have been proved. They need not, however, be set out in the indictment.

■ Also there is no need to allege in the indictment the existence of a clear and present danger. This is a question of law for the judge to decide and must be considered to determine whether the statutes under which the prosecution has been brought may be constitutionally applied. The court's conclusion on this phase of the case is given to the jury in the course of the court's charge. It is not, however, something which need be specifically set out in the indictment any more than it is necessary to allege in the indictment that the statutes therein referred to are constitutional. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; United States v. Frankfeld, D.C., 103 F.Supp. 48, affirmed, 4 Cir., 198 F.2d 679; United States v. Fujimoto, D.C., 102 F.Supp. 890; United States v. Flynn, D.C., 103 F.Supp. 925, affirmed, 2 Cir., 216 F.2d 354. The defendants in the present case are sufficiently apprised of the claim of subordinate facts from which the conclusion of clear and present danger may be drawn by those portions of the indictment which allege that the conspiracy operated with "the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit."

■ Neither is it necessary that the indictment allege facts showing that there is a probability of overthrow of the Government or that the defendants are in a position of power to effect the overthrow. It is enough to have alleged teaching and advocating and organizing for the purpose of the overthrow and destruction of the Government of the United States by force and violence, with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit. The matter of probability of overthrow, or of power in the defendants to achieve it are matters of proof to be considered by the jury in the light of the court's charge. Even so the Government does not have to prove that, if not prevented, the carrying out of the purposes of the conspiracy would have been successful. The majority in Dennis v. United States, supra, says [341 U.S. 494, 71 S.Ct. 867]: "If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby

they will strike when the leaders feel the circumstances permit, action by the Government is required. * * * Certainly an attempt to overthrow the Government by force, even though doomed from the outset because of inadequate numbers or power of the revolutionists, is a sufficient evil for Congress to prevent." It appears, therefore, that the indictment is not insufficient for any of the reasons set out in paragraph six of the defendants' motion.

■ Paragraph seven of the defendants' motion to dismiss claims that the overt acts alleged in the indictment do not satisfy the requirements of the general conspiracy statute, Title 18 U.S.C.A. § 371, because they are not acts to effect both or either of the objects of the alleged conspiracy and that on the face of the indictment the overt acts are in furtherance of the conspiracy charged under Section 3 of the Smith Act repealed June 24, 1948, and barred by the statute of limitations.

It is a well settled principle that in the averment of overt acts in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy. Wong Tai v. United States, 273 U.S. 77, 80–81, 47 S.Ct. 300, 71 L.Ed. 545. See also Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013; and Williamson v. United States, 207 U. S. 425, 28 S.Ct. 163, 52 L.Ed. 278.

■ The indictment plainly alleges that the overt acts described were done "in pursuance and furtherance of said conspiracy and to effect the objects thereof." Overt acts need not be in themselves criminal. United States v. Aderman, 7 Cir., 191 F.2d 980. The claim of the bar of the statute of limitations on the conspiracy charge has been previously discussed. It should also be noted that all of the overt acts alleged in the indictment took place within the three years immediately preceding June 4, 1954, the date of the return of the indictment. Because of this and the reasons previously stated, the overt acts alleged in the indictment are not to be held deficient for the reasons claimed by the defendants.

■ Overt Act No. 17, which has to do with an allegation that the defendant Silverman used the false name of "Saul Cooper" during a particular period for a specified purpose, has been made subject to a motion by the defendants to strike it from the indictment on the ground that any act such as the one alleged was not done to effect the objects of the purported conspiracy. Considering the allegations in the indictment that identify the purposes of the conspiracy with alleged illegal activities of the Communist Party, there can be no doubt that Overt Act No. 17, which states that defendant Silverman's use of a false name was "to conceal his identity and to carry out plans of the underground apparatus of the Communist Party * * *", is part and parcel of means alleged to have been adopted by the defendants to effectuate the conspiracy. No reasonable inference can be drawn from the inclusion in the description of the overt act of the words "to conceal identity and to carry out the plans of the underground apparatus of the Communist Party" that these expressions of immediate purpose preclude the act from being a part of the general purpose to effect the objects of the alleged conspiracy.

The motion to dismiss on grounds stated in paragraphs one through seven and the motion to strike Overt Act No. 17 are denied.

### Motion for a Bill of Particulars

■ The particulars which the defendants seek to compel the Government to reveal to them cover all kinds of details of alleged meetings: the time, place and purpose of each, who was there, what was said and done relative to the various acts charged in the indictment. They include a request for a statement of the written matter connected with the charges, copies of them, the

time and place of publication and who wrote and circulated them; what classes were held, what was taught and the defendants' connection therewith. They also seek a specific description of alleged plans of the Communist Party to go underground, as well as other minutiae connected with the allegations of the indictment. The things sought are evidentiary in nature and the motion is designed to gain a disclosure of the Government's evidence in advance of trial. To this the defendants are not entitled.

The motion is brought under Rule 7(f) of the Federal Rules of Criminal Procedure which was a restatement of existing law on the subject. Rule 7 Committee notes.

■■ Under the Federal Constitution and laws, the indictment must be sufficient to advise the defendants of the nature and cause of the accusation in order that they may meet it and prepare for trial, and after judgment, be able to plead the record and judgment in bar of a further prosecution for the same offense. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; and United States v. Kushner, 2 Cir., 135 F. 2d 668.

The indictment in this case amply fulfills these requirements.

The motion for a bill of particulars is denied.

## Motion for Inspection of Grand Jury Minutes, Production of Documentary Evidence and Disclosure of Witnesses

■■ The defendants claim that the purpose of this motion is to reach certain evidence alleged to have been illegally seized from the defendants and to have been produced before the Grand Jury. The District Attorney has filed an affidavit to the effect that no material or documents seized from the defendants at the time of their arrest were presented to the Grand Jury. The defendants' counsel agreed that this affidavit made the further pressing of the motion unnecessary and it is, therefore, denied.

■■ The defendants' motion for production and inspection of documentary evidence is denied and the Government's motion to quash is granted. The defendants' motion in paragraph 2D(c) is so broad as to include privileged and confidential records of the Department of Justice outside of material presented to the Grand Jury and material to be offered as evidence on the trial. The granting of the motion as a whole is discretionary, United States v. Schiller, 2 Cir., 187 F.2d 572, and I am not satisfied that good cause has been shown. This is not to say that consideration would not be given to the granting of such a motion if a proper reason is given for it and the motion is divested of the aura of an attempted discovery. Bowman Dairy Co. v. United States, 341 U.S. 214 at page 220, 71 S.Ct. 675, 95 L.Ed. 879.

■■ The defendants have also moved for a disclosure of the Government's witnesses. They have no right to such a disclosure, and they have advanced no persuasive reason why it should be granted; it is, therefore, denied. United States v. General Petroleum Corporation of California, D.C., 33 F.Supp. 95.

## Motion for Preliminary Hearing and Offer of Proof

■■ The defendants have moved for a preliminary hearing on the issue of clear and present danger. It is their thought that a trial of this case will be completely obviated and the indictment should be dismissed if, at a separate hearing they can prove by some means or other, the peaceful nature of world conditions and the absence of international tensions at the time of the indictment. Their theory is that the Government, to prevail on the issue of clear and present danger, must prove two things: (1) speech by the defendants advocating and teaching the overthrow of the United States Government by force and violence; and (2) inflammable world conditions. They claim that proof of peaceful world conditions will completely remove the second of these es-

sential elements and the indictment will, therefore, fall. This theory is untenable. Each of these elements must be examined in the light of the other and must be measured together, not separately. There may be a clear and present danger in moderately disturbed world conditions and highly provocative speech; or it may be found in highly inflammed world conditions and less inciting speech. No determination of this issue can be made apart from the facts of this particular case. It can only be dealt with at its proper place in the course of trial and any offer of proof should be made at that time.

The motion is denied.

### Motions to Stay Proceedings and to Dismiss Because of Public Law 637—83rd Congress

These defendants were indicted by the Grand Jury on June 4, 1954. Subsequent thereto, on August 24, 1954, there came into operation Public Law 637 of the 83rd Congress known as the Communist Control Act, 68 Stat. 775 et seq., 50 U.S.C.A.Appendix, §§ 782 et seq., 841 et seq. It is the claim of the defendants that the Communist Control Act hinders and prevents them from preparing and conducting their defense because it

"penalizes the exercise of their rights to confer with possible witnesses and other persons concerning evidence to be presented, and inhibits possible witnesses and other persons from so conferring with the defendants and from giving them possible evidence; since it will serve to inhibit and prevent persons from testifying at trial on behalf of these defendants; since it will serve to prejudice the jury in making its findings as to certain basic elements of the offense charged; and since it would penalize the pursuit of the normal duties and obligations of legal counsel in such a prosecution, all in violation of the rights of the defendants to due process and counsel under the

Fifth and Sixth Amendments to the Constitution of the United States."

The defendants also claim that the passage of the Communist Control Act repealed the Smith Act, Title 18 U.S.C. A. § 2385, on which the indictment against them is, in substantial part, based, or that it, by implication, amended the Smith Act and rendered it unconstitutional by making it violative of the "due process clause" of the Fifth Amendment and the "Assistance of Counsel" provision of the Sixth Amendment for the same reasons as those above stated and because "it withdraws from the jury the power to make findings of fact as to basic elements of the offense charged;" also by making it violative of the provisions of Clause 3 of Section 9 of Article I prohibiting the passage of bills of attainder.

If the defendants to prove their innocence under the indictment, personally or through their counsel, need to confer with persons who were formerly (i. e. before August 24, 1954) members of the Communist Party or an organization having similar objectives, the Communist Control Act will not prevent them from doing so, for the defendants in dealing with the allegations of the indictment are concerned only with events prior to June 4, 1954, the date it was returned. The Communist Control Act does not attempt to cover acts committed prior to its effective date. Section 4 of the Communist Control Act, 50 U.S.C.A. § 843, says, "Whoever knowingly and willfully becomes or remains a member * * *" etc., which plainly means after August 24, 1954, and Section 5, 50 U.S.C.A. § 844, relative to evidence to be considered in trying a case under the Communist Control Act must be read in connection with Section 4 as admissible only to show membership or participation after August 24, 1954. Furthermore conferring about matters which happened prior to June 4, 1954, for the purpose of defense in this case certainly does not come within the proscribed purposes set out in the Communist Control Act, and this

would be so even if the witness or other person whom the defendants consult is at the time a member of the Communist Party in wilful violation of the Communist Control Act. Nor by conferring with such person concerning such past events for the purpose of his defense does a defendant or his attorney open himself to prosecution under the new act.

It is, of course, true that a present, past or future member of the Communist Party or a person in some manner identified with it, in view of the Communist Control Act might, when asked to testify that one or more of these defendants were not members of the Communist Party, be reluctant to reveal himself as one who knew all about the Communist Party membership from his own membership or office holding within the party. This, however, is a difficulty with which persons charged with crime frequently have faced in the past and doubtless will often face in the future without rendering unconstitutional the criminal statute under which they are charged. One charged with burglary may be in need of the testimony of an unapprehended accessory who will not come forward to testify for him because the accessory statute would make him chargeable. This, however, does not make the statute against burglary unconstitutional.

[23] The defendants further argue that the Communist Control Act effects a conclusive finding as a matter of law that the Communist Party and the members of it advocate and teach the duty and necessity of overthrowing and destroying the Government of the United States by force and violence—something which under the present indictment the Government must prove and the jury must find. The answer to this is that the Communist Control Act is not applicable to this case at all, for the indictment was returned nearly three months before the effective date of the act. The defendants assert that such a legislative act, however, creates a climate or atmosphere so unfavorable to them that

they cannot receive a fair trial because it will be impossible to procure an impartial jury. But the passage of the act was the result of public opinion and sentiment, not the cause of it. It is not tenable to suppose that the passage of the act, in and of itself, engendered in the general public feelings of more intence hostility toward communism than existed before its passage. With regard to the effect of the attitude of the public, Judge Hand's opinion in the Dennis case 183 F.2d 201 at page 226, quoted by Judge Harlan in the Flynn case, 216 F.2d 354 at page 374, states the law of the matter. It says in part:

" ' "* * * Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have. * * *" ' "

The claim of the defendants that the Smith Act has been repealed or amended by the Communist Control Act cannot affect the indictment in this case. As mentioned above the indictment was returned on June 4, 1954, and the Communist Control Act became effective on August 24, 1954, almost three months later. The latter did not expressly repeal or amend the former nor did it expressly release or extinguish any penalty, forfeiture or liability incurred under the former. Assuming arguendo, however, that there was such a repeal or amendment (by implication), it could not reach back to touch the Smith Act or modify its effectiveness as it stood on June 4, 1954, because of that portion of Title I U.S.C.A. § 109 which provides as follows:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such stat-

ute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. * * *"

This applies not only in case of repeal, De La Rama Steamship Co., Inc., v. United States, 344 U.S. 386, 73 S.Ct. 381, 97 L.Ed. 422 but also in the case of an amendment, Schenck v. United States, 249 U.S. 47, 53, 39 S.Ct. 247, 63 L.Ed. 470; and Moorehead v. Hunter, 10 Cir., 198 F.2d 52. It further disposes of the defendants' claim that the Smith Act, amended by the Communist Control Act, created a bill of attainder, prohibited under Article I of the Constitution. Also if, for the purpose of argument, it is assumed that the Communist Control Act did amend the Smith Act retroactively, and the amendment created, in effect, a bill of attainder, the invalidity of the amendment on constitutional grounds would make the amendment a nullity and would leave the validity of the Smith Act, as it stood on June 4, 1954, unimpaired. Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254; Shore v. Cross, D.C., 7 F.Supp. 70; and Reitz v. Mealey, 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21.

The motion to stay the proceedings and the motion to dismiss the indictment on grounds based upon the enactment of the Communist Control Act, Public Law 637—83rd Congress, are denied.

### The Challenge to the Array

The defendants have attacked the indictment on the ground that the grand jury which returned it was drawn from an illegally selected jury list. It is their contention (1) that the jury commissioner and clerk delegated the duty of selecting jurors to unauthorized persons and (2) that the jury list did not constitute a true cross-section of the community. A hearing was held on the motion to dismiss the indictment on these grounds and testimony was presented and heard over a period of six court days.

The grand jury which returned this indictment on June 4th, 1954, was impaneled on September 28, 1953. The jury list from which prospective grand jurors were drawn on September 2, 1953, was prepared in the late July or early August of 1953 for the commencement of jury trials in September and was referred to in the testimony as the 1953 list.

The jury commissioner had held office continuously since 1935 and the clerk had held his office continuously during that period and for many years prior thereto. The procedure used in making up the 1953 list followed the practice which had developed during their tenure of office. An estimated two-thirds to three-quarters of the names on the list were sent to the jury commissioner by others whom he knew or of whom he had heard and to whom he had written requesting them to recommend names to him for the jury list. During the course of the testimony, the people making these recommendations were referred to as "sponsors." The remaining one-third to one-quarter of the names were either volunteers, i. e., people who asked the jury commissioner to place them on the jury list and others who made the same request at the clerk's office, or were personal friends of the commissioner or acquaintances whom he met on the street and asked to serve. The names selected were placed upon individual cards and the cards were then placed in the box in the clerk's office by the jury commissioner and the clerk, alternately, one at a time. Following this in 1953, there was a drawing in open court on September 2nd of forty names for grand jurors and fifty names for petit jurors.

The number of names in the box at the time of the drawing was four hundred fourteen, of which three hundred thirty-one were names carried over from the 1952 list and eighty-three were names newly added in 1953. In connection with the selection of jurors, a questionnaire had been prepared which was usually sent out by the chief deputy

clerk to each person whose name appeared on the jury list calling for information concerning the juror's full name, residence address, business address, occupation, age, place of birth, citizenship, health, jury service, conviction of any offense in any state or federal court, education, qualification as a voter, public office held, etc. When completed and returned, each questionnaire was filed in the clerk's office. If the juror's name had been carried over from the preceding year and his questionnaire was on file, no new questionnaire was sent to him. If there was no questionnaire on file for a juror because his name had been newly added or for any other reason, a questionnaire was sent to him, but only after his name had already been placed in the box by the clerk and the jury commissioner, and only after his name had been drawn by the chief deputy clerk at a public drawing. The sole exception to this was in connection with the volunteers (about twenty a year), who appeared at the clerk's office and who were given questionnaires and told to fill them out and return them immediately.

Following the drawing of September 2, 1953, it was found by the chief deputy clerk that of the forty names drawn for grand jury duty, there were in the clerk's office questionnaires from only six of the persons drawn. He thereupon sent out questionnaires to the others and ultimately had in hand questionnaires for thirty-seven of the forty drawn. The chief deputy clerk examined each of the questionnaires for the purpose of advising the court of any apparent disqualifications and of any reason to excuse any of those drawn. Of the forty drawn, three were considered disqualified as no questionnaires were received from them, and fourteen were excused by the court. On September 28, 1953, the remaining twenty-three were summoned and after being sworn and charged, constituted the grand jury.

Section 1864 of Title 28 U.S.C.A. governing the manner of drawing names for jury duty provides that the names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing.

What is a "qualified" person is defined by Section 1861 which provides:

"Any citizen of the United States who has attained the age of 21 years and resides within the judicial district, is competent to serve as a grand or petit juror unless:

"(1) He has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

"(2) He is unable to read, write, speak and understand the English language.

"(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service.

"(4) He is incompetent to serve as a grand or petit juror by the law of the State in which the district court is held."

The statute of the State of Connecticut prescribing the qualifications of jurors is Section 7906 of the 1949 Revision and it reads as follows:

"All jurors shall be electors not less than twenty-five years of age, esteemed in their community as persons of good character, approved integrity, sound judgment and fair education, and with no permanent disability impairing their capacity to serve as jurors."

When the procedure adopted by the jury commission (i. e. the clerk of the court and the jury commissioner) in making up the official jury list is considered in the light of the standards specified by the governing statutes, there arises a question which lies somewhat outside of the two grounds urged by the defendants in their motion to dismiss but which is allied to them. That question is: did the jury commission fulfill its express statutory duty of placing

in the box preparatory to the drawing of September 2, 1953, the names of not less than three hundred qualified persons? This question cannot be answered in the affirmative because the jury commission, which alone had power to decide who was qualified, did not know at that time; moreover, it still did not know at the time of the hearing. The testimony of the members of the jury commission makes inescapable the conclusion that neither of them knew whether the persons whose names were on the 1953 jury list and which had been placed in the box by them for the drawing of September 2nd, 1953, were "qualified" under the statutory standards or not; and their testimony [1] with

1. Portion of Testimony of the Jury Commissioner:

Redirect Examination by Mr. Gruber.

"Q. Mr. Morris, with respect to the names that you received from the various sponsors, will you tell us, please, whether you checked those names after you received them so as to determine whether or not the individual whose name appeared was an elector? A. No.

"Q. Did you check whether or not that individual had attained the age of twenty-five years? A. No. Those details would appear on the questionnaire which was sent out afterward.

"Q. You did not check the name when you received it? A. No.

"Q. Did you check whether or not the individual had been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights had not been restored by pardon or amnesty? A. No.

"Q. Did you check whether or not the individual was able to read, write, speak and understand the English language? A. No.

"Q. Did you check whether or not the individual was incapable by reasons of mental or physical infirmities to render efficient jury service? A. No.

"Q. Did you check whether or not the individual was incompetent to serve as a grand or petit juror by the law of the State of Connecticut? A. No.

"Q. Did you check whether or not the individual was of good character, approved integrity and judgment, or fair education? A. There would be no check. That would be a question of the preliminary source from which the name came."

\* \* \* \* \*

Portion of Testimony of Clerk

Direct Examination by Mr. Gruber:

"Q. And you are the Clerk of the District Court of Connecticut here in New Haven? A. Yes.

"Q. And have been for how long? A. Well, Deputy and Clerk, sixty-two years. (Pause.)

"Mr. Gruber: I am just holding my breath! It's a long time.

"Q. In connection with the jury list, Mr. Pickett, can you tell us whether you submitted, during the last four or five years, names to the Jury Commissioner to be put on the list? A. I think it's possible that without solicitation I have; may have suggested two or three names. I don't distinctly remember. Not over that.

"Q. But not over that? A. No.

"Q. And that applies to the last four or five years? A. Yes.

"Q. And when you submitted those names did you give them to Mr. Earl or directly to Mr. Morris, do you recall? A. Oh, I gave them to my Chief Deputy.

"Q. Mr. Earl? A. Mr. Earl, in the last year or two. With direction to send the questionnaire and the letter accompanying it to them.

"Q. Now, what did you do, Mr. Pickett, in connection with placing the names, or the cards, in the box? Would you describe and tell the Court what you did? A. I first received word from Mr. Morris that he was ready; made an appointment. He came to my office. And we alternately deposited the names, or the cards, that he had submitted.

"Q. Specifically with reference to 1953, do you recall about when that was? A. I think he gets the—or he makes up the list, I believe, sometime during July and August, or before the opening of the fall term.

"Q. So that was sometime in August that you put the names— A. I should think it was August or September.

"Q. Prior to the time that you put these names, with Mr. Morris, into the box, did you know whether there were questionnaires available for all the people that went into the box? A. Not personally.

"Q. Did you, before the names went into the box, examine any of the questionnaires of the people whose names appeared on the cards? A. No.

"Q. Did you examine the questionnaires, after the names went in, of such people as for whom questionnaires were available? A. No. I had nothing to do with them after they came in.

that of the chief deputy clerk shows beyond question that the commission had not adopted any method or set up any machinery through which, directly or indirectly, such information would come to them even in the form of the opinions or conclusions of other persons. The only basis the jury commission had for determining the qualifications of two-thirds to three-quarters of the persons placed on the jury list, with the exception of a very few persons on the list whom either or both may have known very well personally, lay in the fact that certain persons whom the jury commissioner had heard of or knew personally to be reputable and trustworthy in the communities drawn from and who have been referred to as sponsors, had sent to the jury commissioner names of persons whom the sponsors thought would be generally suitable for jury duty. While this was a perfectly proper and legitimate method of procuring names of persons in the first instance to be considered for eventual inclusion in the jury list after a determination of the presence of necessary qualifications, it hardly sufficed as a complete method for such determination. While their recommendations of general suitability could be used to cover such general qualifications as being esteemed in the community as persons of good character, approved integrity, sound judgment and fair education, the sponsors were given no information as to the statutory qualification standards, and their replies gave no information relative to whether or not the person was a citizen, an elector, a resident of the district, one who had not been convicted of a felony, etc.—the specific qualifications required by Title 28 U.S.C.A. § 1861. The questionnaires sent to the prospective jurors were designed to provide the jury commission with the information relative to these specific qualifications but they were never used for this purpose. Of course, instead of a questionnaire other suitable methods could have been adopted, but there is no evidence that any other device was used. When forty names were drawn on September 2, 1953, for the grand jury in question, there were in the hands of the chief deputy clerk questionnaires of only six of those drawn. After the drawing but before September 28, 1953, the day the jury was summoned, questionnaires were received by the chief deputy clerk from thirty-one additional persons of the forty drawn. But none of these questionnaires was examined or considered at all by the jury commission nor did the commission feel that it had anything to do with them. The clerk testified that he left all that to the chief deputy; and the chief deputy revealed that the primary purpose of the questionnaires was not for the use of the jury commission but for the purpose of advising the judge of any persons on the jury list whom the judge might feel ought to be excused by him pursuant to Title 28 U.S.C.A. § 1863, an authority resting in the court alone and wholly unrelated to the powers and duties of the jury commission. United States v. Flynn, 2 Cir., 216 F.2d 354, at page 387. The chief deputy clerk also testified that an incidental purpose of the questionnaires was to advise attorneys of the personal histories of those drawn for jury duty. But no use was made of them by the jury commission. Except for the questionnaires of persons whose names were carried over from the jury list of the preceding year and except for the few (twenty or so) volunteers who came directly into the clerk's office and who were immediately

"Q. You had nothing to do with the questionnaires? A. after they came?

"Q. After they came. A. They were turned over to my efficient Chief Deputy.

"Q. Is it your testimony that you saw the questionnaires of the people on the '53 list neither before they were placed in the box nor afterwards? A. I did not.

"Q. You did not see them? A. I re-

ceived them but they were turned over immediately to my Deputy.

"Q. And you made no independent check at the time? A. None whatever."

Mr. Gruber: I have no further questions.

Mr. McNamara: No questions, your Honor."

given questionnaires, it was the practice not to send out the questionnaires until *after* the drawing.

 It is obvious from the provisions of Title 28 U.S.C.A. § 1864 that it is the members of the jury commission and no one other than the members of the jury commission, who have the power and the duty to select the persons whose names make up the jury list; and, while there are "no set standards detailing the methods of selection to be used", United States v. Dennis, 183 F. 2d 201 at page 217, nevertheless, the jury commission has a positive, affirmative duty to have in the box in the words of the statute, "the names of *not less* than three hundred *qualified* persons *at the time of each drawing.*" This statutory provision is mandatory. To be "qualified" the persons must meet the standards provided by Section 1861 of Title 28 U.S.C.A. Flexibility in methods of selection and allowance for the exercise of discretion in applying the qualification standards to prospective jurors, which the jury commission certainly has, must not be taken as authority for varying the statutory standards or as license to omit the application of any one or all of them entirely. The failure by the jury commission to have determined that there were at least three hundred qualified names in the box at the time of the drawing of the grand jury on September 2, 1953, was a breach of the affirmative statutory duty imposed upon the commission and is fatal to the indictment returned against these defendants on June 4, 1954.

 The inspection of the questionnaires by the chief deputy clerk subsequent to the drawing for the purpose of advising the judge of any persons concerning whom the court might see fit to exercise its excusing power under Section 1863 cannot cure the defect in the procedure caused by the non-feasance of the jury commission. Nor is it necessary that there be a showing of prejudice to the defendants.

"\* \* \* reversible error does not depend on a showing of prej-

udice in an individual case. \* \* The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." Ballard v. United States, 329 U.S. 187 at page 195, 67 S.Ct. 261, at page 265, 91 L.Ed. 181.

It is sufficient for this purpose and for the burden of proof, which here rests on the defendants, that there has been proven the breach of a mandatory statutory duty. The burden is, of course, initially upon the defendants as "the attackers of jury legality" to overcome the presumption that the jury commission discharged its duties properly. United States v. Fujimoto, D.C., 105 F.Supp. 727; but where, as here, evidence is presented, principally from the members of the commission itself, which conclusively shows that there was complete non-feasance by the commission of an essential portion of its duties, it is clear that the presumption, which of itself has no probative force but only aids the making out of a prima facie case, is overcome.

Broadly viewed, the plan adopted by Congress for the procuring and impaneling of jurors is in two stages. The first stage begins with the first consideration of names of prospective jurors by the jury commission and ends—when the commission's work ends—when the two members of the jury commission alternately drop the cards of the jury list into the box. The second stage begins with the drawing and ends at the swearing-in of the panel. In the first stage the selection of persons is governed by the exercise of the discretion and judgment of the jury commission, operating within the framework of the qualification standards provided by statute; in the second stage the selection of persons is required to be governed by the laws of chance or some method which completely precludes the exercise of discretion, power of choice or any arbitrary act by any one. The purpose is to provide qualified jurors who are

also fair and impartial, as well as to safeguard against the possibility of packing juries. The basic scheme is designed to this end. The excusing power of the court under Section 1863 and the provisions for challenges under Section 1870 are supplemental, but not substitutionary, aids to the same end. Both a person presented before a grand jury and the Government have a right to have the prospective jurors drawn from a box containing the names of three hundred qualified names. In the operation of the laws of chance, a drawing of forty names out of three hundred or more qualified names is quite a different proposition from drawing forty names out of one hundred or two hundred qualified names.

■ There can be no less than sixteen and no more than twenty-three on a grand jury and, whether there are one or two drawings in the process of selecting the number ordered, both the Government and the defendants are entitled to have the odds on the random selection of particular jurors influenced by the fact that the initial drawing is from a minimum of three hundred qualified names on the jury list. The result can then be varied only by action of the court under the excusing power, Title 28 U.S.C.A. § 1863, or under Title 18 U.S.C.A. § 3321, in the event that less than sixteen are available.

It is not necessary here to decide whether or not the grand jury would have been considered properly impanelled if between September 2, 1953, the date of the drawing, and September 7, 1954, the date of the filing of the defendants' motion, the jury commission had checked the qualifications of the persons on the jury list and had determined that there were in fact three hundred or more qualified persons on the list at the time of the drawing of September 2, 1953, because the members of the commission never made any such check or determination; and even if we assume that the chief deputy clerk, contrary to his own testimony, was acting, not as an aid to the court in exercising its excusing power, but in assistance to the clerk as a member of the jury commission, in making a subsequent check of the qualifications of the persons on the jury list, he examined only the questionnaires of persons whose names had been actually drawn, which between September 2, 1953, and September 7, 1954, totalled no more than one hundred thirty-two out of the four hundred fourteen names on the 1953 jury list; in fact, if we reach back to September 2, 1952, and add the number checked between that date, a year before the drawing of the grand jury, and the final day of the hearing, November 24, 1954, we find a total of only one hundred sixty-two.

A number of cases have been cited both by the Government and the defendants dealing with this general subject. None of these cases, however, presents a similar fact situation. The recent cases decided by the Court of Appeals for the Second Circuit, United States v. Dennis, 183 F.2d 201 at page 216 and United States v. Flynn, 216 F. 2d 354 at page 378, in discussing challenges to the array, were concerned with allegations of discrimination against excluded groups and failure to select a representative cross-section of the community. In the course of the very thorough analysis of the procedure followed in the Southern District of New York, the complete and proper application of the eligibility standards imposed by Federal and State statutes is manifest. In the Flynn case, supra, 216 F.2d at page 387, there is repeated emphasis upon the qualification standards which, the facts of the case show, were carefully and systematically applied.

Several references have been made by the parties to Walker v. United States, 8 Cir., 93 F.2d 383 and United States v. Murphy, D.C., 224 F. 554. It appears in the Walker case, supra, that the jury commission obtained names of prospective jurors by writing to reliable persons throughout the district, requesting names of persons with particular qualifications for jury duty. The commission then made the final choice for the jury list. The court held that this was a legitimate method for the commis-

sion to use in procuring names. It should be noted that the Walker case was prior to the enactment of Title 28 U.S.C.A. § 1861 and the qualifications of jurors were determined solely by the law of the State in which the district was located. A comparison of the letter sent out by the jury commission with the qualifications required by the law of Missouri, which there applied, shows that the letter, through the description of the kind of persons sought, together with the information to be returned with the names suggested, substantially covered the statutory standards and gave the jury commission a reasonable basis for selecting a person so recommended. In the present case the letter sent by the jury commission to the sponsors did not include a description of the qualifications required by the statutes of the United States and of the State of Connecticut. The Murphy case stands for the principle that the jury commission may not delegate to others its duty of selecting prospective jurors. The present case, however, is not one in which there was the misfeasance of such delegation, but rather the non-feasance of failing to perform an essential part of its duty. I do not find that there was here any intention on the part of either the jury commissioner or clerk to turn over his duties to unauthorized persons.

■■■■ The defect in selecting the jury which is fatal to the indictment in this case, is a flaw in the machinery of procuring jurors rather than a specific finding that there were people on the grand jury who should not have been there. Both the grand and petit juries of the Federal Court in this District have enjoyed and still enjoy a well deserved reputation for their integrity, their intelligence, and their careful and conscientious performance of duty. This has largely been the result of the efforts of the jury commissioner, who drew upon the acquaintances and connections made in an active and distinguished career through eighty-four years of life and of the clerk who has just completed sixty-two years as deputy clerk and clerk of this court. It was the very concentration of this effort in the direction of seeking out and selecting persons of outstanding intelligence and integrity which caused them to assume the presence of all the statutory qualifications without specifically examining into them. The present finding of this defect in the selection of the 1953 jury list does not call into question or invalidate past verdicts returned by panels drawn from the 1953 jury list. Any right the parties may have had to attack the jury on this basis has long since been waived. Frazier v. United States, 335 U.S. 497 at page 503, 69 S.Ct. 201, 93 L.Ed. 187; Francis v. Southern Pacific Co., 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798; United States v. Klock, 2 Cir., 210 F.2d 217 at page 220; Ford v. United States, 5 Cir., 201 F.2d 300; Dean v. United States, 9 Cir., 169 F.2d 70; York v. United States, 8 Cir., 167 F.2d 847.

To some extent the commission may also have felt that, if any person whose name was drawn from the jury list was in fact disqualified, such disqualification would be noticed by the chief deputy clerk and be called to the attention of the court by him. However, as the judges' letter sent out by the clerk's office with the questionnaire makes clear, the questionnaires were intended to be used by the jury commission in selecting the prospective jurors for the jury list prior to the placing of the names in the box.

In view of the ruling already indicated, it is not necessary to go further into the grounds of the defendants' motion. Suffice it to say concerning the claim of discrimination and the failure of the jury list to represent a true cross-section of the community, the evidence made it abundantly plain that, except for a praiseworthy leaning toward persons having a reputation for intelligence and integrity, there was no intentional discrimination practiced by the commission; but on the contrary it distinctly endeavored to include a broad representation of races, faiths, national origins and occupations.

While the defect of omission in this case, as stated above, appears only to affect the machinery of selecting jurors, the adoption of a policy which overlooks or permits such errors would, even though they were unconscious by-products of a worthy intent, open the door to serious invasion of the safeguards surrounding the institution of the grand jury. The motion to dismiss the indictment is granted.

Rule 12(b) (5) of the Federal Rules of Criminal Procedure provides in part:

"If the court grants a motion based on a defect in the institution of the prosecution or in the indictment * * * it may also order that the defendant be held in custody or that his bail be continued for a specified time pending the filing of a new indictment * * *."

All of the defendants in this action are now at liberty on bail. Therefore, under the provision of Rule 12(b) (5) of the Federal Rules of Criminal Procedure the bail of each defendant is hereby continued, subject to such orders relative to enlargement as are now outstanding, for a period of 21 days from this date, pending the filing of a new indictment.